UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD C. MEADE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. Action No. 2:24-cv-01704-JFM |
| Plaintiff, | ) ) | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | ) ) | |
| LINCOLN NATIONAL CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) | |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................................7

THE PARTIES.....................................................................................................................7

SUBSTANTIVE ALLEGATIONS .....................................................................................9

    The Company and Its Business.................................................................................9

    Insurance Company Capital Adequacy...................................................................12

    The Reserves / Unlocking Process..........................................................................13

    By the Start of the Class Period, Lapses Were a Focal Point of Concern for Life
        Insurance Companies ..................................................................................15

    Prudential Flags a Potentially Negative Industry  Study in Advance of Its Annual
        Review and  Then Takes a Large GUL-Related Charge, Citing that Study..........16

    In Advance of Lincoln's Annual Assumption Review, Defendants Repeatedly
        Tout the Sufficiency of Lincoln's SGUL Reserves, Downplay the
        Potential  Impact of the Industry Study, and Highlight Lincoln's Capital
        Strength ......................................................................................................18

    The Truth Emerges – Weeks Later, Lincoln  Reveals a Massive Nearly $2 Billion
        GUL-Related Charge, Defendants Place Significant Blame on the Industry
        Study, and Lincoln's Stock Price Plummets.............................................22

    A Number of Other Insurance Companies with SGUL Policies on Their Books
        Did *Not* Take Massive Related Charges ...............................................29

DEFENDANTS' MATERIALLY FALSE AND MISLEADING  STATEMENTS AND
    OMISSIONS DURING THE CLASS PERIOD.................................................34

RELEVANT POST-CLASS PERIOD DEVELOPMENTS............................................53

ADDITIONAL SCIENTER ALLEGATIONS.................................................................55

    The Individual Defendants Controlled the  Company's Messaging to the Investing
        Public ..........................................................................................................55

    The Individual Defendants' Numerous and Specific Statements During the Class
        Period Regarding Lincoln's Assumption Review Support a Strong
        Inference of Scienter .................................................................................56

Page

Lincoln's "Very Robust" Assumption Review Process,  Which Included Its Own "In-Depth GUL Study" Covering  the Relevant Period, Supports a Strong Inference of Scienter ...................................................................57

Defendants' Access to the GUL Industry Study *at Least* Six Months Prior to Announcing Lincoln's Updated Lapse Assumptions Supports a Strong Inference of Scienter ...................................................................60

Corporate Scienter ...........................................................................................61

LOSS CAUSATION/ECONOMIC LOSS ...................................................................61

NO SAFE HARBOR ...............................................................................................63

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ...........................................................................................................64

CLASS ACTION ALLEGATIONS ...........................................................................65

COUNT I ...........................................................................................................66

Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants .....................................................................................................66

COUNT II ...........................................................................................................67

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants .....................................................................................................67

PRAYER FOR RELIEF ...........................................................................................68

DEMAND FOR TRIAL BY JURY ...........................................................................68

Lead Plaintiff Local 295 IBT Employer Group Pension Trust Fund ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts and upon information and belief as to all other matters based upon the investigation undertaken by counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Lincoln National Corporation ("Lincoln" or the "Company"), press releases, analyst and media reports, and other public reports and information about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons, other than Defendants (defined below) who purchased or otherwise acquired Lincoln common stock between December 8, 2021 and November 2, 2022, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Lincoln is a holding company that operates multiple well-known insurance and retirement businesses through its subsidiary companies.  This case arises from Defendants' numerous materially false and misleading statements to investors relating to Lincoln's reserves for its guaranteed universal life insurance policies ("GUL"), particularly those policies with secondary guarantees ("SGUL") and the Company's overall capital strength, in the face of intense market scrutiny on both related topics.

3.      Pursuant to state regulation, insurance companies are required to set aside capital sufficient to ensure that they are able to pay claims as they become due.  The amount of these so-called capital "reserves" are based on various factors and assumptions.

4.     As set forth herein, the adequacy of GUL policyholder lapse[1] assumptions used to calculate reserves was an issue many insurance companies faced by the beginning of the Class Period.  That is because, at that time, many life insurance policyholders were keeping their policies active, *i.e.*, preventing them from lapsing.  When insurance companies have more policies remaining in effect on their books, they have to increase their reserves to account for eventually paying out those additional policies.  Indeed, on December 8, 2021, defendant Dennis Glass, Lincoln's then CEO, acknowledged that, with respect to GUL, "there are some questions in the industry about policyholder lapse assumptions.  People are concerned that people will pay more premium for longer than what the pricing assumed," thereby extending the insurer's exposure to potential claims.  Glass rejected this notion, stating "***[w]e don't think so, but we'll have to see how that plays out over time***."[2]

5.     Five months later, on May 4, 2022, Prudential Financial Inc. ("Prudential") – one of Lincoln's main competitors in the life insurance business – informed its investors in advance of its annual assumption review[3] that it had "recently receive[d] a new industry study that indicates experience is more adverse in some of our assumptions of our U.S. life insurance business.  We're evaluating this information and its applicability to our business, and to the extent that it would cause an increase in reserves or a decline in earnings."  Following its annual actuarial assumption review, on August 2, 2022, Prudential announced it had taken a $1.4 billion charge after updating its assumptions to policyholder lapses in its GUL block.  Analysts covering Prudential observed that, on

---

[1]    The Society of Actuaries and the Life Insurance Marketing and Research Association include "termination for nonpayment of premium" in their definition of an insurance policy lapse.

[2]    Unless otherwise noted, all emphasis is added.

[3]    Insurance companies such as Lincoln and Prudential typically conduct annual assumption and reserve reviews to ensure that their reserves appropriately reflect their future obligations and that the assumptions underlying their reserve calculations are accurate, based on updated information.

Prudential's August 3, 2022 earnings call, management explained that "[t]he actuarial assumption review…was informed by an ***industry study***," and that "[m]anagement indicated the basis for the assumption update was a proprietary ***industry study***[.]"

6.    Lincoln held its second quarter of 2022 ("2Q22") earnings call the very next day, on August 4, 2022.  In the wake of the charge taken by Prudential, Defendants were peppered with questions about Lincoln's own annual assumption review.  Defendant Randal Freitag, Lincoln's CFO, addressed the issue by noting, among other things, that Lincoln participated in a GUL industry study, stating, in pertinent part:

> And as a leading player in the life business, we have a lot of data.  That data gets incorporated.  We've been adjusting all of our assumptions every year reflecting that data.  We did participate in a study, an additional study this year.  By the way, we do that all the time around assumptions, but ***there was a particular study this year focused on GUL.  We participated in that. So we have that study. And I'm sure the team will incorporate any new things they can learn from that process.***

7.    But Defendants did not leave it at that.  Simultaneous with Defendants' disclosure about Lincoln's participation in and possession of the GUL industry study – which they later acknowledged to be the same study cited by Prudential – they repeatedly downplayed its possible impact on Lincoln's overall review.  Defendants also spoke encouragingly about the likely outcome of the two specific actuarial tests conducted in the SGUL reserving process (described more fully herein).  For example, when asked about the Company's SGUL reserves on the August 4, 2022 call, defendant Freitag – himself an actuary – stated, *inter alia*, that "***we've seen the potential impact from [the two specific actuarial tests] decline over the time. We haven't even talked about it for at least a year, near as I can remember.  So at a high level, we feel good about there*** . . . ."

8.    Defendants also consistently misrepresented the strength of Lincoln's capital position, particularly regarding its ability to repurchase Company stock.  On the same August 4, 2022

earnings call, Freitag stated, *inter alia*, that "***[w]e are confident in our balance sheet and pleased to be continuing buybacks in the current market environment***."

9.      Then, during a September 8, 2022 insurance conference, defendant Freitag again spoke favorably about the SGUL actuarial subtests, the results of which Lincoln was to report at the end of that quarter, stating: "***in fact, we've sort of come out of the negative situation and we've built up some level of sufficiency inside of those 2 subtests.   So, I feel good about the sufficiency[.]***"  Freitag also again referenced the new industry study, stating that there was a study "***specifically focused on Guaranteed Universal Life that provides some new information, and we'll hand use that information***."

10.      Finally – with just two weeks remaining in the fiscal quarter during which Lincoln conducts its annual actuarial assumption review – defendant Ellen Cooper, who became Lincoln's CEO during the Class Period, downplayed the significance of the industry study.  At a September 14, 2022 financial services conference, Cooper relayed, "***you know that we did participate in the industry study that was cited on one of our competitors in terms of that negatively impacting their overall results.   That would simply be an input for us as would many other factors as we look at overall experience***. . . ."  Analysts covering the financial services conference heard Cooper loud and clear – the industry study was just one spoke in the wheel of its overall review process, writing that "Ellen [Cooper] did clarify that the [SGUL] industry study is ***just one input***."

11.      At the same conference, Cooper – herself an actuary – put a positive spin on the actuarial subtests conducted in the SGUL reserving process, by declaring that "***[l]ast year, when we looked at those tests, we had a cushion there.   And with interest rates being higher than they were a year ago, we would expect that there would be even more of a cushion as a result of higher capital market environment***."

12.     Just seven weeks later, however, on November 2, 2022, Defendants shocked the market by announcing that Lincoln had taken a massive *$2.197 billion* charge – *$1.8 billion* of which was primarily a direct result of updates to its GUL policyholder lapse assumptions. Defendants further disclosed that Lincoln was required to record a staggering *$550 million* statutory reserve charge, based on the outcome of the same actuarial subtest that defendant Cooper just told investors was expected to result in Lincoln having "*even more of a cushion*" for in the current year.

13.     In addition, Defendants disclosed that the statutory capital impact resulted in a 22 point decline to Lincoln's risk-based capital ("RBC") ratio (explained more fully below), to approximately 360%.  Lincoln also announced that the updated lapse assumptions would cause its future after-tax operating income to be reduced by an astounding *$180 million* annually ($45 million per quarter after tax).

14.     Stunningly, Defendants blamed the massive charge in large part on the *same industry study*: (i) for which Lincoln had collected and provided information about its own GUL lapse rates; (ii) that Defendants had been consistently referencing in their statements to investors; (iii) that Lincoln already had in its possession for several months; and (iv) that Defendants had repeatedly downplayed the significance of.  According to defendant Freitag, "[c]ombining our own data with *a significant amount of experience contained in the industry study that I referenced on last quarter's call* gave us the credible data needed to update our assumptions[.]"  Cooper would later assert that "*with the industry study, we then had 7x the amount of information than what we had had just a couple of years prior*."  As to Lincoln's own internal data, Defendants revealed that Lincoln itself had conducted an "*in-depth GUL study*" – covering at least 2019 through 2022 – which measured "age 75+ policies that have faced a 'minimum fund or lapse' decision."  Defendant

Cooper further explained that Lincoln's internal data had "provided deeper insights into anticipated behavior patterns in later policy durations."

15.     Defendants also revealed the substantial impact these developments had on Lincoln's capital position, announcing that "***while we prioritize balance sheet resilience to replenish our capital, we are pausing share repurchases***."

16.     Analysts were uniformly shocked by these revelations.  One wrote that "[t]he impact of [Lincoln's] actuarial review was ***well beyond what we would have judged to be our worst-case scenario before the fact***."  In another report – titled "Credibility Undermined by Outsized Charge" – analysts remarked that "[w]hile some charge was not unexpected, given a similar charge by one [of] its peers earlier this year, ***the magnitude of the charge was substantially larger than expected***."

17.     Also concerned about the announcement that Lincoln was pausing its share repurchases, analysts wrote that "LNC announced that it was pulling its buyback for an indefinite period of time in a capital preservation effort.  In our view, this is a significant negative for the stock as ***it expresses a lack of confidence in the company's capital position***."

18.     In reaction to this news, the price of Lincoln common stock suffered its worst stock decline in over 15 years, plummeting ***33.14%***, from $52.10 per share on November 2, 2022 to a close of $34.83 per share on November 3, 2022, wiping out approximately $3 billion in market capitalization in a single day.  As the market continued to digest the above disclosures, the price of Lincoln common stock fell another 4.5% over the next two trading days.  Three months later, defendant Freitag – Lincoln's longtime CFO and the head of its Life Insurance business – stepped down from the Company.  Through this action, Lead Plaintiff seeks to recover the damages that it and other Class members have suffered as a result of Defendants' violations of the federal securities laws, and the resultant decline in the value of Lincoln common stock.

**JURISDICTION AND VENUE**

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

20.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Lincoln maintains its headquarters in this District and many of the acts and conduct that constitute the violations of the law complained of herein occurred in this District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities market.

**THE PARTIES**

23.     Lead Plaintiff Local 295 IBT Employer Group Pension Trust Fund is a multiemployer defined pension plan for full time actively employed members and retirees in New York.  Lead Plaintiff manages approximately $570 million in assets under management for the benefit of more than 5,500 active and retired plan participants.  During the Class Period, Lead Plaintiff purchased Lincoln common stock, as set forth in its previously filed certification (ECF No. 10-4), and was damaged thereby.

24.     Defendant Lincoln is a holding company, headquartered in Radnor, Pennsylvania, operating multiple insurance and investment management businesses through its subsidiary companies.  Through its business segments, Lincoln sells a range of wealth accumulation, wealth protection, group protection and retirement income products and solutions.  Lincoln common stock

trades on the NYSE under the ticker "LNC." "Lincoln Financial Group" is the marketing name for LNC and its subsidiary companies.

25.    Defendant Ellen Cooper ("Cooper") has served as President and Chief Executive Officer ("CEO") of Lincoln since May 27, 2022. Cooper is also currently the Chairman of Lincoln's Board of Directors. Prior to her elevation as CEO, Cooper was Lincoln's Executive Vice President, Chief Investment Officer, and Head of Enterprise Risk and Annuity Solutions. Cooper holds a Bachelor of Business Administration in Actuarial Science from Temple University, and is a Fellow of the Society of Actuaries.

26.    Defendant Dennis Glass ("Glass") was Lincoln's President and CEO from July 2007 until May 27, 2022. Glass was also a director on Lincoln's Board of Directors. Prior to being appointed CEO, Glass was President and Chief Operating Officer of Lincoln Financial Group.

27.    Defendant Randal Freitag ("Freitag") was Lincoln's Executive Vice President and Chief Financial Officer ("CFO") from January 2011 until he stepped down from the Company in February 2023, shortly following the end of the Class Period. In addition to his role as CFO, in June 2017, Freitag became responsible for overseeing Lincoln's Life Insurance business. Freitag holds a Bachelor's degree in mathematics and is a Fellow of the Society of Actuaries.

28.    Defendants Cooper, Glass, and Freitag are collectively referred to herein as the "Individual Defendants" and, together with Lincoln, as the "Defendants."

29.    During the Class Period, the Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's SEC filings, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

30.     Founded in 1905, Lincoln is a holding company operating multiple insurance and retirement businesses through its subsidiaries. Lincoln has four business segments: (i) Life Insurance; (ii) Annuities; (iii) Group Protection; and (iv) Retirement Plan Services.

31.     This case primarily concerns Lincoln's Life Insurance business segment, through which the Company offers various products, including universal life insurance ("UL"). UL is a type of life insurance product offering coverage for the insured's lifetime in exchange for the payment of a premium. Policyholders can set their premium amounts as well as their death benefit amount while the policy is in force. UL has a built-in cash value component that grows over time and earns interest.

32.     UL products can be offered with a lifetime guarantee ("GUL"). GUL offers lifelong coverage and a guaranteed death benefit in exchange for a fixed premium. In contrast to other UL policies, GUL policies accumulate negligible – if any – cash value for the policyholder during their lifetime. Because GUL policies are more focused on the death benefit than the cash value, GUL is often more affordable than other life insurance options that last for a policyholder's lifetime.

33.     The Society of Actuaries[4] and the Life Insurance Marketing and Research Association's ("LIMRA")[5] definition of an insurance policy lapse includes "termination for nonpayment of premium."  Most life insurance policyholders must make payments on their policies to avoid losing coverage.  Some policies provide holders with grace periods during which their policy will not lapse if they miss a payment for a specified period of time.  If a life insurance policy lapses, the policyholder will no longer be covered and the policy will no longer be in effect.  Thus, if a policyholder dies with a lapsed policy, the insurer is not obligated to pay the death benefit of the policy to the policyholder's beneficiaries.

34.     Life insurance companies such as Lincoln rely on lapsed policies as a source of financial gain.  According to a 2016 paper authored by two professors at the Wharton School of Business, titled Lapse-Based Insurance, "[i]nsurers profit from policyholders who lapse and lose money on those who do not lapse."[6]  Some policyholders may spend years paying hundreds of thousands of dollars into a life insurance policy, only to let it lapse.  When that happens and the policyholder dies, the life insurance company reaps the benefit of not paying death benefits to the intended beneficiary of that policy.

35.     GUL policies can also be offered with a lifetime secondary guarantee, often referred to as "SGUL" policies.  The secondary guarantee allows the policyholder to maintain coverage

---

[4]   The Society of Actuaries is one of the most prominent and widely recognized actuarial associations, particularly in the United States, that serves individuals working in the actuarial profession.  During the Class Period, defendants Cooper and Freitag were Fellows of the Society of Actuaries.

[5]   LIMRA is a global research, consulting, and professional development organization that primarily serves the financial services industry, particularly life insurance, retirement, and financial services companies.

[6]   Daniel Gottlieb and Kent Smetters, *Lapse-Based Insurance*, WHARTON FACULTY PLATFORM (June 6, 2016), https://faculty.wharton.upenn.edu/wp-content/uploads/2016/11/Insurance41.pdf.

solely through premium funding.  This means that so long as the policyholder pays the minimum premium amount or funds the policy to a specified value, the policy will stay active and the policyholder will remain covered even if the cash value of that policy drops to zero.  In other words, SGUL policies are often referred to as "no-lapse" policies, because the policy remains intact with minimal upkeep from the policyholder.  Certain SGUL plans are designed with cash value growth linked to specific market indices or mutual fund growth.  This anticipated cash value growth can reduce the insurance company's cost of funding death benefits.

36.    SGUL policies first appeared on the market in the late 1990s.  Originally, these policies remained active as long as the premiums that the policyholder paid were the same amount as the underlying guarantee premium.  Eventually, SGUL policies became popular and life insurance companies expanded the ways in which policyholders could keep their policies active.  As a result, multiple SGUL product designs became available.

37.    Life insurers earn a great deal of their profit by investing their customers' premiums in bonds until such time as the claims come due.  When insurance companies price their policies, they make assumptions about the amount of interest income they will earn investing those premiums years into the future.

38.    In the years leading up to and during the Class Period, extremely low interest rates proved problematic for life insurance companies, particularly with respect to SGUL policies.  The guarantee associated with the policy is a promise that the annual premium bill will never increase during the insured's lifetime.  As a result, it is the insurance company who bears the responsibility for any shortfall in interest income.  Given the prolonged period of low interest rates following the financial crisis, life insurance companies earned far less than they had forecast they would through investing their customer's premiums in bonds.

- 11 -

39.    Lincoln ultimately exited the GUL insurance market.  As defendant Cooper stated on Lincoln's November 3, 2022 earnings call, "[i]nterest rates have been lower than assumed in pricing and were a significant driver of our decision some years ago to reduce sales dramatically and ultimately exit the GUL market."

### Insurance Company Capital Adequacy

40.    Insurance industry regulators use certain metrics to assess an insurance company's solvency and ability to meet its financial obligations to its policyholders.  Chief among them are: (i) statutory capital; and (ii) the risk-based capital ratio.

41.    Statutory capital, a critical measure of an insurance company's financial health, is the minimum amount of capital and/or surplus necessary for an insurance company to support its overall business operations.   Under guidelines provided by the National Association of Insurance Commissioners ("NAIC") – which each state uses to formulate its specific insurance rules and regulations – insurance companies are required to monitor statutory capital and surplus compared to investment and insurance risks to quantify the minimum amount of statutory surplus needed to operate the business.

42.    In addition to statutory capital, insurance regulators monitor the insurer's risk-based capital, or RBC.  RBC is an element of the U.S. regulatory framework for monitoring the solvency of insurance companies, which establishes a *de facto* minimum level of capital.  The RBC ratio is a critical measure which regulators utilize to assess the financial strength and risk level of an insurance company, and assesses a life insurer's capital strength, including the ability to pay insurance claims and annuity benefits.

43.    The RBC ratio, which measures an insurance company's capital adequacy, is calculated by dividing the company's total adjusted capital by its RBC.  The more risk a company has, the more capital it must hold to cover it.  Potential risks an insurance company may face include

asset risks, underwriting risks, and interest rate risks. Insurance companies are required to maintain RBC levels at certain percentages, which assures that the company has sufficient assets to protect against potential risks. The NAIC defines RBC requirements and RBC ratio thresholds for when regulatory intervention is required.

44.     A company's statutory surplus or a reduction thereof can impact a company's RBC ratio. As Lincoln stated in its Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed with the SEC on February 17, 2022 (the "2021 Form 10-K"):

> Our insurance subsidiaries must maintain certain regulatory capital levels. We utilize the RBC ratio as a ***primary measure of the capital adequacy*** of our insurance subsidiaries. The RBC ratio is an ***important factor*** in the determination of the credit and financial strength ratings of LNC and its subsidiaries, as a reduction in our insurance subsidiaries' surplus may affect their RBC ratios and dividend-paying capacity.

Consequently, the RBC ratio is a focal point for investors and analysts alike.

### The Reserves / Unlocking Process

45.     Insurance companies such as Lincoln conduct annual assumption reviews as part of their financial management and regulatory compliance process. During the process, data is collected on various policies, claims, and market conditions. Items taken into account during an insurance company's reserve review include, *inter alia*, mortality rates, morbidity rates, policyholder lapses and interest rates.

46.     Lincoln conducts its annual assumption review in the third quarter of every year. As Lincoln stated in its 2021 Form 10-K, "[d]uring the third quarter of each year, we conduct our comprehensive review of the assumptions and projection models used in estimating [SGUL] reserves and unlock assumptions…." While Lincoln conducts its annual assumption review in the third quarter, it purports to "periodically review our experience and update our policy reserves for new issues and reserve for all claims incurred, as we believe appropriate."

47.     Within the context of insurance company reserve assumptions, "unlocking" refers to the process of adjusting the assumptions used to calculate reserves for different insurance policies. Reserves reflect an insurance company's current expectations about its future obligations with the unlocking process.  When insurance companies "unlock" their assumptions, they revise them to reflect updated information.  The "unlocking" process can result in an insurance company either: (i) strengthening its reserves, should the assumptions point to increased future liabilities; or (ii) releasing reserves, and thereby reducing the amount of funds set aside to cover future claims and obligations.

48.     Typically, unlocking occurs during a company's review process, such as its annual assumption updates.  But, as Lincoln stated in its 2021 Form 10-K, "[w]e may have unlocking in other quarters as we become aware of information that warrants updating assumptions outside of our comprehensive review."

49.     Insurance companies employ teams of internal actuaries who use models to assess the adequacy of their reserves under various scenarios.  To that end, an NAIC Model Regulation entitled "Valuation of Life Insurance Policies," commonly known as "Regulation 830" or "Model #830" outlines the minimum valuation of standard statutory reserves for certain life insurance products, including SGUL policies.  NAIC Actuarial Guideline XXXVIII ("AG 38") clarifies the application of Model #830 with respect to certain SGUL policies.

50.     Within AG 38, there are five subsections which provide specific guidance on the calculation of statutory reserves for SGUL policies issued in various time periods.  Most states, if not all, include AG 38 as part of their state-specific insurance rules and regulations.

51.     Relevant herein are AG 38 Sections 8C and 8D.  Section 8C of AG 38 applies to all universal life insurance products with secondary guarantees issued between January 1, 2007 through

December 31, 2012, while Section 8D of AG 38 includes certain SGUL polices issued between July 1, 2005 and December 31, 2012. The 8C and 8D tests direct the determination of statutory reserve requirements and consider, among other factors, lapse rates.

**By the Start of the Class Period, Lapses Were a Focal Point
of Concern for Life Insurance Companies**

52. In the lead up to the Class Period, life insurance companies were affected by the economic impact of COVID-19. As a result of COVID-19, more life insurance policyholders were keeping their policies active, *i.e.*, fewer life insurance policies were lapsing than in previous years. In light of this market shift, life insurance companies were tasked with closely monitoring policyholder activity to establish accurate policyholder lapse assumptions.

53. For example, the Society of Actuaries and LIMRA released updated results of a survey on September 10, 2020, titled, "COVID-19 Asset/Liability Management Survey Summary of Results." This survey, in which 26 insurance companies participated, analyzed COVID-19 and its potential impact on the insurance industry. With respect to policyholder behavior monitoring, 17 of the 26 participating companies responded that they were "tracking *lapse*, withdrawal and policy loan activity *more frequently* in the current environment."[7]

54. On December 8, 2021, defendant Glass acknowledged that "there are some questions in the industry about policyholder lapse assumptions. People are concerned that people will pay more premium for longer than what the pricing assumed." Despite the general concern among many life insurance companies about a shift in policyholder behavior, Glass rejected this notion for Lincoln's GUL business, stating "*[w]e don't think so, but we'll have to see how that plays out over time*."

---

[7] *COVID-19 Asset/Liability Management Survey Summary of Results*, SOCIETY OF ACTUARIES & LIMRA (Sept. 10, 2020), https://www.soa.org/4a59e9/globalassets/assets/files/resources/research-report/2020/covid-19-alm-survey.pdf.

**Prudential Flags a Potentially Negative Industry
Study in Advance of Its Annual Review and
Then Takes a Large GUL-Related Charge, Citing that Study**

55.     On May 4, 2022, the CFO of Prudential – one of Lincoln's main competitors in the life insurance business – informed its investors that, in advance of its upcoming actuarial assumption review, it had "recently receive[d] a new industry study that indicates experience is more adverse in some of our assumptions of our US life insurance business." Prudential's CFO continued: "[w]e're evaluating this information and its applicability to our business, and to the extent that it would cause an increase in reserves or decline in earnings. . . ."

56.     Analysts covering Prudential took note of the potentially negative industry study. The next day, Barclays issued a report stating that "PRU mentioned that a new industry study is indicating experience is more adverse in some assumptions of its US life insurance business. PRU is evaluating this information to assess the extent that it would cause an <u>increase</u> to reserves or <u>decline</u> in earnings." (Emphasis in original).

57.     Then, on July 1, 2022, Credit Suisse issued a report stating that "[a] new industry study indicated PRU's mortality experience may be more adverse than its current assumptions. If PRU updates its mortality assumptions, its life segment reserves could increase and run-rate earnings could decline."

58.     On August 2, 2022, following its annual actuarial assumption review, Prudential announced that it had taken a **$1.4 billion charge** as a result of an "unfavorable comparative impact from our annual assumption update and other refinements." On Prudential's earnings call, held the next day, its CFO explained that the charge related to its "guaranteed Universal Life products, where we lowered our lapse and surrender assumptions, and that revision reflected information we gained from recently released studies and surveys as well as our recent emerging experience." Prudential's

CFO also clarified that the industry study he referenced "was done by a private party and **_did involve_** **_a number of people in the industry_**."

59.    After Prudential's earnings call, several analysts issued reports detailing that the industry study played a significant role in Prudential updating its assumptions.  For example, analysts from J.P. Morgan issued reports stating that Prudential "[m]anagement indicated the basis for the assumption update was a **_proprietary industry study_**. . ." and "[t]he policyholder persistency change, mostly due to Universal Life products, was caused by lower lapse and surrender assumptions incorporating the results of a recent **_industry study_**."

60.    Likewise, Piper Sandler analysts wrote, in a report issued the same day, that, for Prudential, "[t]he actuarial assumption review that reduced go forward earnings power of largely the Individual Life business…was informed by an **_industry study_** conducted."

61.    In addition, analysts from RBC commented, in an August 3, 2022 report, that "there was a charge of about $1.4 billion that included charges for both changes in customer behavior and mortality. The behavioral impact was based upon a **_study_** and reflected changes in lapse rates and surrender charges.  Management indicated this constituted the bulk of the charge."

62.    On the heels of Prudential's outsized GUL charge, market participants became concerned that other insurance carriers would likewise announce their own GUL reserve shortfalls. As described by the Society of Actuaries in its August 2022 U.S. Insurance Company Earnings Review, Prudential's charge "**_stoked fears_** that Prudential will be first of many carriers to acknowledge reserve shortfalls for guaranteed universal life."[8]

---

[8]    U.S. Insurance Company Earnings Review, SOCIETY OF ACTUARIES (Aug. 2022), https://www.soa.org/4a5250/globalassets/assets/files/resources/research-report/2022/us-insurance-co-earning-q2-2022-report.pdf.

**In Advance of Lincoln's Annual Assumption Review, Defendants Repeatedly
Tout the Sufficiency of Lincoln's SGUL Reserves, Downplay the Potential
Impact of the Industry Study, and Highlight Lincoln's Capital Strength**

63.     On August 4, 2022 – the day after Prudential's earnings call – Lincoln held its own

2Q22 earnings teleconference, attended by defendants Cooper and Freitag.  Lincoln's SGUL

assumption review was, unsurprisingly, a major topic of discussion.

64.     For example, an analyst from Autonomous Research LLP asked about Lincoln's

"SGUL exposure" and that he was "hoping you could talk a little bit about your current lapse

assumptions for the block and maybe provide any color on how the[y] compared to the industry or

maybe how they've changed over time?"

65.     Defendant Freitag responded by mentioning, among other things, the GUL industry

study being available to the Company for its review process, stating, in pertinent part:

> In general, Erik, our assumption review process is very robust. It's got a huge
> number of controls around it. There are a ton of really talented people that are
> involved in that process. I'm not going to front run that work. We'll go through our
> assumption review, and we'll talk about it on next quarter's call.
>
> So what I can tell you is that at a high level, the setting of assumptions is something
> that gets better, the more data you have, the talented people you have.  And as a
> leading player in the life business, we have a lot of data.  That data gets incorporated.
> We've been adjusting all of our assumptions every year reflecting that data.  We did
> participate in a study, an additional study this year.  By the way, we do that all the
> time around assumptions, but ***there was a particular study this year focused on
> GUL. We participated in that. So we have that study***. *And I'm sure the team will
> incorporate any new things they can learn from that process.*

66.     But defendants Freitag and Cooper did not end the discussion about Lincoln's

assumption review there.  First, responding to an analyst's question about Lincoln's SGUL exposure

and its "capital adequacy," defendant Freitag – a Fellow of the Society of Actuaries – took the

opportunity to speak about the impact from the two specific actuarial tests conducted in the SGUL

reserving process, by stating, *inter alia*, that "***we've seen the potential impact from an 8C and 8D***

- 18 -

***decline over the time.  We haven't even talked about it for at least a year, near as I can remember. So at a high level, we feel good*** *about there*. . . ."

67.    Defendant Freitag also addressed lapses, in pertinent part, as follows:

[W]hen it comes to lapses, I'm not going to specifically discuss GUL, but I think there have been some things that have occurred over the last couple of years that have been discussed across the industry.  So let's just remind ourselves of what those were.  The pandemic raised in the minds of consumers, the value of life insurance.  And almost immediately with the onset of the pandemic, you saw lapse rates fall across every product, every type of life insurance.

And then after about 3, 4 quarters, you started to see them tick back up, and that's what you've seen.  ***They haven't recovered all the way back to pre-pandemic levels, but they have come back up***.  So at a high level, I think that -- hopefully, that gives you some context around what has been a pretty interesting couple of years in terms of lapse experience and how you should think about the future.  For instance, will it recover back to pre-pandemic levels, will it level out at some point.  I think those things all go into the pot.  But Erik at a high level, we have a lot of data. We seek any data we can and we incorporate that into our assumptions every year.

68.    In addition, defendant Freitag flagged the "strength of [Lincoln's] capital position," stating, *inter alia*, that "***[w]e are confident in our balance sheet and pleased to be continuing buybacks in the current market environment***" and highlighted that "[w]e've bought over 50% of our shares back.  We're very proud of that.  ***It's something we'd expect to continue looking forward***."

69.    As the Society of Actuaries conveyed in its August 2022 U.S. Insurance Company Earnings Review, "a question about Prudential's charge surfaced in several competitor calls. Randy Freitag, Lincoln's CFO, said ***the conservativeness of Lincoln's GUL reserves*** *for statutory reporting purposes meant that whatever the company does with lapse assumptions on its GUL policies, **it's unlikely to affect share buyback**.*"  *See supra* note 8.

70.    Then, on September 8, 2022, defendant Freitag spoke on behalf of Lincoln at the KBW Insurance Conference.  The KBW analyst made clear that, in the eyes of the market, Lincoln's review of its SGUL reserves was the key issue then-facing the Company.  The analyst began the

conference by stating, "[s]o, I'm just going to start **with the topic everyone's been asking you about**, I guess, we can now get over with at the beginning…So let's start with the **Universal Life or secondary guarantees**. . . ."

71.     In responding to the KBW analyst, defendant Freitag once again spoke favorably about the SGUL actuarial subtests under AG 38 Sections 8C and 8D, the results of which Lincoln was to report at the end of the quarter.  This time, Freitag stated that "**_in fact, we've sort of come out of the negative situation and we've built up some level of sufficiency inside of those 2 subtests. So, I feel good about the sufficiency_**. . . ."

72.     Freitag also reiterated that information from the new GUL industry study was available to Lincoln for its annual assumption review, stating that there was a study "**specifically focused on Guaranteed Universal Life that provides some new information, and we'll hand use that information**."

73.     Then, on September 14, 2022, defendant Cooper spoke on behalf of Lincoln at a Barclays Global Financial Services Conference.  Despite declaring that "you all know that -- and you've heard us talk about this that **we cannot speak to third quarter or third quarter unlocking inter-quarter**" – Cooper nevertheless openly discussed various aspects of Lincoln's assumption review, including the applicable actuarial subtests under AG 38 Sections 8C and 8D and the new GUL industry study.

74.     For example, asked by an analyst about the "concern around an assumption review that you're doing this quarter" and whether there would be "some drag or impact from the assumption review," defendant Cooper – a Fellow of the Society of Actuaries – gave a bullish response about the SGUL actuarial subtests.  Cooper declared (with just two weeks remaining in the quarter) that "**these particular subtest[s] 8C, and 8D,…[l]ast year, when we looked at those tests,**

we had a cushion there.  **And with interest rates being higher than they were a year ago, <u>we would expect that there would be even more of a cushion</u> as a result of higher capital market environment**."

75.     As to the industry study, Cooper first confirmed that it was in fact the same study that adversely impacted Prudential's assumption review (and which Prudential had received and flagged to its investors in May – four months prior – as being "adverse" to its assumptions), stating that "**you know that we did participate in the industry study that was cited on one of our competitors in terms of that negatively impacting their overall results**."  She then heavily downplayed its significance to Lincoln's overall assumption review process, declaring that the same study "**<u>would simply be an input for us as would many other factors as we look at overall experience</u>**. . . ."

76.     Barclays analysts covering the conference took defendant Cooper's declaration at face value, writing in a report issued later that day that "Ellen [Cooper] did clarify that the [SGUL] industry study is **<u>just one input</u>**" in its overall review process.

77.     Cooper also added that Lincoln's assumption review would include their "own experience" and "any industry experience as well that could potentially be additive to that."

78.     The market's focus on learning the outcome of Lincoln's actuarial assumption review was intense.  The next week, on September 21, 2022, Piper Sandler issued an analyst report stating that "**all eyes are focused on impact from LNC's annual actuarial assumption review in 3Q22**."  The Piper Sandler report continued, "**[t]he concern is primarily on exposure to secondary guarantee universal life (SGUL) as LNC's exposure to the product is among the highest in our coverage** with reserves for universal life & variable universal life with secondary guarantees amounting to nearly 40% of life insurance reserves at 2Q22."

**The Truth Emerges – Weeks Later, Lincoln**
**Reveals a Massive Nearly $2 Billion GUL-Related Charge, Defendants Place Significant**
**Blame on the Industry Study, and Lincoln's Stock Price Plummets**

79.    On November 2, 2022, after the market closed, Lincoln filed a Form 8-K with the SEC announcing its results for the third quarter of 2022 ("3Q22").  In the filing, Lincoln reported a staggering $2.6 billion net loss for 3Q22, or a loss of $15.17 per diluted share available to its common stockholders.  Lincoln reported that its adjusted operating results included a ***$2.197 billion*** "GAAP unlocking charge."  According to the Company, the "[m]ain driver" of the enormous charge was a "***$1.8B*** impact from GUL lapsation assumption update."

80.    Lincoln further revealed that the charge had a substantial impact on Lincoln's statutory capital and RBC ratio.  As detailed in the Form 8-K, the charge "correspond[ed] to an estimated ***$550 million statutory capital impact*** equating to a ***22-point decline*** in [Lincoln's] risk-based capital ratio."  Defendant Cooper was quoted in the Form 8-K stating that "[t]he significant charge we recorded during the third quarter and the statutory capital impact to be booked at the end of 2022 resulted from our annual assumption review ***primarily due to policyholder lapsation behavior in our guaranteed universal life insurance block*** and will contribute to a decline in our RBC ratio."  The Form 8-K further stated that "the review charge and the statutory impact both relate primarily to ***updated guaranteed universal life insurance lapse assumptions in response to emerging experience, combined with recently validated external industry perspectives***."

81.    In addition, Defendants revealed that the impact of Lincoln's GUL assumption update was not only severe in the short-term, but was going to be felt by the Company on an ongoing basis, announcing that Lincoln's future after-tax operating income would be reduced by a staggering ***$180 million annually*** ($45 million per quarter after tax).  The following slide detailing the Company's annual assumption review was appended to Lincoln's November 2, 2022 Form 8-K:

## 3Q22 annual review of actuarial assumptions

$2.1B GAAP unlocking charge

- Includes $2.2B operating and $0.1B non-operating impacts in Life Insurance

  ○ Main driver in Life Insurance is $1.8B impact from GUL lapsation assumption update

- Also includes $0.2B favorable impact in Annuities from higher interest rates

$180M decline in Life Insurance annual run-rate after-tax operating income

$550M estimated statutory capital impact to be booked in 4Q22

- ~22-point RBC impact

- No impact to ongoing cash flow

| Impacts by business unit ($M, after-tax) | 2022 GAAP Impact |
|---|---|
| Life | $(2,197) |
| Annuities | 217 |
| Group Protection | 1 |
| Retirement Plan Services | 6 |
| **Total Operating Impact** | **(1,973)** |
| Non-Operating Impact | (86) |
| **Total GAAP Net Income Impact** | **$(2,059)** |
| **GAAP Earnings Run-Rate Impact** | **$(180)** |

| Life impact breakdown ($M, after-tax) | 2022 GAAP Impact |
|---|---|
| Policyholder Behavior | $(1,776) |
| Mortality | (223) |
| Morbidity | (106) |
| Reinsurance | (81) |
| Other | (11) |
| **Total Operating Impact** | **(2,197)** |
| Non-Operating Impact | (103) |
| **Total Net Income Impact from Life Insurance** | **$(2,300)** |

©2022 Lincoln National Corporation    4

82.     Also appended to the November 2, 2022 Form 8-K, was the following slide detailing

that a "*[l]arge amount of industry study data* gave confidence in updating assumption around older

age policyholder behavior":



83.    Defendants also revealed that Lincoln had conducted its own GUL study.  As noted in a footnote to the above slide, Lincoln carried out an "***in-depth GUL study***" which measured, *inter alia*, "***age 75+ policies that have faced a 'minimum fund or lapse' decision***" covering a period of at least 2019 through 2022.

84.    The next morning, on the Company's 3Q22 earnings call, defendants Cooper and Freitag elaborated on these developments.  In a significant shift from their recent public statements, defendants Cooper and Freitag blamed the massive charge in large part on the very ***industry study***: (i) for which Lincoln had collected and provided information about its own GUL lapse rates; (ii) that Defendants had been consistently referencing in their statements to investors; (iii) that Lincoln already had in its possession for several months; and (iv) that Defendants had repeatedly downplayed the significance of.

85.    According to defendant Freitag, "[c]ombining our own data with ***a significant amount of experience contained in the industry study that I referenced on last quarter's call*** gave us the credible data needed to update our assumptions[.]"  Freitag elaborated on the impact of the industry study on Lincoln's updated GUL lapse assumptions as follows:

> ***A significant amount of data that we're able to achieve, not only as our own experience grows, but with access to the industry study, which included 9 participants and gave us the amount of data to understand how policyholders should be expected to behave in the future when they come to this point of do they have to pay additional premium***.

86.    Moreover, as defendant Cooper explained, "[o]ver the last several years, ***as Lincoln's GUL policy experience has materialized, it has provided deeper insights into anticipated behavior patterns in later policy durations***, ***which were subsequently supplemented with the recent industry experience study***.  As a result, we have reset our assumptions to reflect lower lapsation going forward."  Cooper would later assert that "***with the industry study, <u>we then had 7x the amount of information</u> than what we had had just a couple of years prior***."

- 24 -

87.     Defendant Freitag quantified the practical impact of the assumption review, describing that Lincoln would be "keeping approximately 8% more of [SGUL] policies in-force. . . . [W]e have about 128,000 policies, 8% of 128,000 means we're keeping about an additional 10,000 policies in-force relative to last year."

88.     Defendant Cooper also explained that the $550 million statutory reserve charge was a consequence of the same AG 38 8D subtest she had recently told investors was expected to provide Lincoln with "***even more of a cushion***" in the current year.  As Cooper described on Lincoln's earnings call: "[o]n a statutory basis, the updated lapse assumptions also produce[d] a ***$550 million*** charge related to the ***8D GUL subtest*** to be booked in the fourth quarter, which translates to about 22 points of RBC."

89.     Defendants Cooper and Freitag provided additional color on the significance of the 22 point decline to Lincoln's RBC ratio and resulting impact on the Company's overall capital position. Cooper stated that Lincoln already had "actions underway to replenish capital back to our target." She then declared, "I want to emphasize the following: while ***we are not satisfied with our projected RBC ratio***, we are taking swift and targeted actions to rebuild to our 400% target."  Defendant Freitag weighed in by stating that, "***[r]ebuilding RBC is our #1 goal***, and we are targeting an RBC ratio of 400%."  As a result, defendant Cooper announced that "***while we prioritize balance sheet resilience to replenish our capital, we are pausing share repurchases***."

90.     Defendant Cooper revealed the serious impact these developments had on Lincoln's capital position, explaining that the Company was "evaluating" whether to issue new preferred stock or hybrid securities "to provide additional margin given the uncertain macroeconomic environment and risk of potential headwinds from that environment beyond what we see today."

91.     Finally, in its 3Q22 Form 10-Q, filed on November 3, 2022, Lincoln elaborated on the long-term impact of these events, announcing that they "expect an ***ongoing reduction in income from operations in future quarters of approximately $45 million per quarter*** as a result of the significantly unfavorable impact of the third quarter 2022 annual assumption review."

92.     Analysts covering Lincoln were dismayed by Defendants' numerous revelations, including: (i) a ***$1.8 billion*** GUL-related GAAP charge; (ii) the ***$550 million*** statutory reserve charge; (iii) the resulting ***22 point decline*** in Lincoln's RBC ratio; (iv) a future after-tax operating income reduction of ***$180 million per year***; and (v) Defendants' immediate pausing of share buybacks while they worked on "balance sheet resilience." Some of the analysts also conveyed that these developments negatively impacted Defendants' credibility.

93.     For example, in a November 2, 2022 report, analysts from RBC wrote that, "[t]he impact of the actuarial review was ***well beyond what we would have judged to be our worst-case scenario*** before the fact." Similarly, in a November 3, 2022 report titled "***Credibility Undermined by Outsized Charge***," Morgan Stanley analysts commented that "[w]hile some charge was not unexpected, given a similar charge by one [of] its peers earlier this year, ***the magnitude of the charge was substantially larger than expected***." The Morgan Stanley report further stated: "[t]o see ***a charge of this magnitude*** follow we expect will undermine confidence for some time." In addition, the Morgan Stanley analysts wrote that "to have ***this magnitude of a charge*** related to lapse assumptions on an elderly portion of its life policies likely has investors viewing the ***company's balance sheet as being somewhat blackbox in nature***."

94.     Likewise, Evercore analysts issued a report stating that "the negative developments that occurred in the life insurance business [were] a ***credibility hit to management***[.]" In a separate report titled "***The Reset – Greater Than Expected GUL Charge, Weaker Go Forward Earnings***,"

analysts from Evercore wrote that "the $2B actuarial review charge came in **well above our $400m assumption**. On a statutory basis, the charge is estimated to correspond to a $550m charge, **above our estimate** of a $300m statutory charge."

95.     Also, in a November 2, 2022 report titled "**LNC: A Catastrophe (and Not the Natural Kind)**," analysts from Wells Fargo conceded that they "had highlighted LNC as a bullish tactical idea headed into the quarter on a view that the absence of bad news could be a positive catalyst for the stock. **We were wrong**."

96.     Analysts from J.P. Morgan were similarly disappointed by Lincoln's announcements, writing in a November 3, 2022 report entitled "**Thud!**" that "LNC's results were marred by a sizable GAAP and stat reserve charge in the individual life block." The J.P. Morgan report went on to state that "**we expect the decline in statutory capital to severely constrain LNC's capital flexibility in the intermediate term**." In addition, the J.P. Morgan analysts were alarmed by the announced ongoing negative impact to earnings, writing that "[t]he **primary change to our model is the impact of lower future earnings in the individual life division ($180 million per year; $45 million per quarter after tax) stemming from updated lapsation assumptions**."

97.     In another report issued the same day, J.P. Morgan analysts wrote that "[a]fter a similar (though of lesser relative importance) UL lapse charge from PRU last quarter, we talked about becoming more cautious on LNC given its concentration in the product…**But the charge was more impactful than we expected**." The J.P. Morgan report also noted that the "22 point decline to RBC with the ratio now expected to end the year at ~360%, down from 427% at FY21, and **well below peers**." Additionally, analysts at RBC stated in a report that "Lincoln's management is tasked with **rebuilding an RBC ratio that has been hit hard by the 3Q actuarial charge** and adverse market conditions."

98.    Further, several ratings agencies reacted negatively to these revelations.   On November 2, 2022, Moody's issued a report changing its outlook on Lincoln to negative and stating that "the negative outlook reflects the ***pressure on Lincoln's capital*** following the large $2.1 billion (after-tax) charge as a result of its annual review of actuarial reserve assumptions."[9]  The following day, S&P Global lowered its "long-term issuer credit rating" on Lincoln, based in part on "its sizeable third-quarter actuarial assumption unlocking charge."[10]

99.    In reaction to this news, the price of Lincoln common stock suffered its worst stock decline in more than 15 years, plummeting ***33.14%***, from $52.10 per share on November 2, 2022 to a close of $34.83 per share on November 3, 2022, on high trading volume of more than 9.8 million shares trading, more than 6 times greater than the average daily trading volume during the Class Period, and eviscerating $2.9 billion in market capitalization in a single day.

100.    *The Wall Street Journal*, in a November 3, 2022 article entitled "Lincoln Shares Fell 30% After Unexpectedly Large Quarterly Charge," summarized these developments, as follows:[11]

> ***Lincoln National shares dropped around 30% in afternoon trading Thursday in the wake of a $2.6 billion third-quarter loss that left Wall Street analysts mincing no words.  "'A catastrophe (and Not the Natural Kind),'" Wells Fargo Securities analysts said in a note to clients Wednesday night, following the after-market release of earnings by [Lincoln]***.   A major feature of those earnings was an ***unexpectedly large, roughly $2 billion charge*** tied to a type of permanent life policy known as "***guaranteed universal life***" that it sold in large volume in past years.

---

[9]    *Moody's affirms Lincoln's ratings; outlook to negative*, MOODY'S INVESTORS SERVICE (Nov. 2, 2022), https://ratings.moodys.com/api/rmc-documents/395011.

[10]    *Lincoln National And Core Subs Downgraded on Weakening Completive Position And Operating Performance; Outlook Stable*, S&P GLOBAL (Nov. 3, 2022), https://disclosure.spglobal.com/ratings/pt/regulatory/article/-/view/type/HTML/id/2911708.

[11]    Leslie Scism, *Lincoln Shares Fell 30% After Unexpectedly Large Quarterly Charge*, THE WALL STREET JOURNAL (Nov. 3, 2022), https://www.wsj.com/livecoverage/stock-market-news-today-11-03-2022/card/lincoln-national-shares-fall-30-after-unexpectedly-large-quarterly-charge-PYqkl7e15V2oyz4xxm81.

*       *       *

> ***Some analysts said the size of Lincoln's charge <u>stunned</u> them***, given Prudential
> Financial, a big rival, took a smaller – but still substantial – charge…of $1.4 billion
> in the second quarter, tied mostly to the [GUL] product.

101.    Analysts continued to react to Lincoln's disclosures on November 4, 2022, with

Barclays issuing a report commenting that "***LNC will need to put out all the stops to rebuild capital***

***back*** following its $550mn statutory reserve charge to its targeted 400% RBC[.]"  In a report issued

the same day, analysts from Wells Fargo wrote that "LNC announced that it was pulling its buyback

for an indefinite period of time in a capital preservation effort.  In our view, this is a significant

negative for the stock as it ***expresses a lack of confidence in the company's capital position***."  As

the market continued to digest the above disclosures, the price of Lincoln common stock fell another

4.5% over the next two trading days, from its closing price on Thursday, November 3, 2022 of

$34.83 per share, to close at $33.26 per share on Monday, November 7, 2022.  Three months later,

defendant Freitag – Lincoln's longtime CFO and the head of its Life Insurance business – stepped

down from the Company.

### A Number of Other Insurance Companies with SGUL Policies on Their Books
### Did *Not* Take Massive Related Charges

102.    Notwithstanding Defendants' placing significant blame on an industry study for

Lincoln's nearly ***$2 billion*** charge, many of Lincoln's peers were not similarly impacted.  In fact,

several of them took little to no action for their SGUL reserves following their respective 2022

annual actuarial reviews.

103.    For example, in a November 3, 2022 report, Piper Sandler analysts wrote that "[t]hese

are ***company-specific issues, & we believe not an emerging industry issue. . . . Most of the life***

***insurance universe have already conducted their annual actuarial assumption review with those***

***remaining not having overly sizeable exposure to the product category that has impacted LNC***."

104.    Likewise, in its December 2022 U.S. Earnings Review, the Society of Actuaries explained:

> Equally interesting, **Lincoln's problems were not seen in three other companies with large presences in universal life**. Prudential apparently took no further action on universal life in Q3.  Brighthouse was asked about the matter but management noted that Brighthouse took approximately a $3 billion charge for this business at the time of Brighthouse's separation from MetLife.  The business, had been "scrubbed."  Manulife, which owns John Hancock, was also pressed on UL reserve adequacy.  Management responded that John Hancock has been careful to keep reserves updated.
>
> Our bottom line: Business mix clearly made a difference in Q3, and accounting policy matters, too.  This was not a good time to have been heavily involved in secondary-guaranty universal life.  And **while it seems to have been an open secret in the life insurance business that lapse assumptions on the product were proving to [be] problematic it also seems that different companies chose to acknowledge the problem at very different paces**.[12]

105.    This topic was a frequent area of discussion on earnings calls for Lincoln's peers in August and November of 2022.  Executives at several of these companies explained their views as to why their firm's SGUL reserves were sufficient as of that time.  For example, on Manulife Financial Corporation's August 11, 2022 earnings call, its Chief Actuary discussed the issue with an analyst, in pertinent part, as follows:

**Meny Grauman – *Scotiabank, Analyst***

… This earnings season, there's been **a lot of focus on universal life with secondary guarantee products given some disclosure from your U.S. peers**. Wondering, if you could talk to your exposure to that specific product line directly and the experience that you're seeing on the lapse and mortality side. And then I have a follow up.

**Steve Finch – *Manulife Financial Corp., Chief Actuary***

Thanks, Meny.  It's Steve here and I'll take that question.  So, some context on our guaranteed UL block in the U.S. Some, I think, notable facts. We stopped writing this business 10 years ago as we shifted away from market-based guarantees. ***And***

---

[12]  U.S. Insurance Company Earnings Review, SOCIETY OF ACTUARIES (Dec. 2022), https://www.soa.org/4af056/globalassets/assets/files/resources/research-report/2022/us-insurance-co-earning-q3-2022-report.pdf.

*what that means is the business is more mature. So the average policyholder age is now roughly mid-70s, and we've -- we're hitting that peak of reserves. So the experience is well developed and the fan of outcomes is narrowing on that business.*

In terms of reserving, *we are prudently reserved on the guaranteed UL business, both on an NAIC basis and IFRS basis. We've consistently updated assumptions. We've already strengthened reserves over the past 5 years*. We strengthened reserves, including a review last year of almost $1 billion over the past 5 years. And our assumptions fully reflect pre-pandemic experience at this stage. As a result, our lapse assumption on this business is below 1%. And last point, on exposure, this business is less than 10% of company reserves.

**Meny Grauman – *Scotiabank, Analyst***

And just as a follow-up, in terms of the upcoming assumption review, you provide disclosure by being neutral on a net basis. But is there any reserve strengthening tied to this specific product that we're talking about in this year's reviews or anything that you're building in for that?

**Steve Finch – *Manulife Financial Corp., Chief Actuary***

On the guaranteed UL, not in this year's review, primarily because the assumptions are up to date for pre-pandemic. I've commented earlier about lapse rates dropping in the pandemic environment. We saw similar things in the global financial crisis. And as the crisis got in the rear-view mirror, we saw lapse rates trend back. *So we feel like the assumptions are up to date. And we -- like I said, we reviewed them last year, so we feel good about those assumptions*.

106.     Similarly, Brighthouse Financial Inc.'s CFO was asked about its SGUL reserves on

the company's November 8, 2022 earnings call. That exchange went, in pertinent part, as follows:

**Tracy Dolin Benguigui – *Barclays, Analyst***

[W]hat about your stat review on ULSG at [Brighthouse's reinsurance subsidiary, Brighthouse Reinsurance Company of Delaware] BRCD, at least for GAAP, you mentioned that three quarters of the positive impact of raising your reversion to the mean assumption is benefiting ULSG? So when you look at your stat reserves, I believe the interest rate assumptions are prescribed, but could you see any benefit on BRCD as a result?

**Edward Allen Spehar – *Brighthouse Financial Inc., Chief Financial Officer***

*So we said last quarter about the conservative nature of stat for ULSG. Just to add to that, we had no updates. I think I said in my prepared remarks, no real updates - impacts from ULSG and our third quarter assumption update on GAAP. If you look at the numbers on stat, most of our block of business today has a 0% assumed*

*lapse rate on stat*.  And all of it will be at 0 by 2027.  And if you were to take the point in time average lapse rate today, which includes surrenders, it's less than 50 basis points.  So on a stat basis, obviously, there's a lot of conservatism, which is not surprising considering the fact that statutory reserves for us for ULSG are around $25 billion [dollars] versus a GAAP number that's more like, let's say, $16 billion, plus or minus.

107.    Also, on Aegon Ltd.'s August 11, 2022 earnings call, its CFO was asked about its

SGUL reserves and assumptions in light of the industry study.  That exchange went, in pertinent

part, as follows:

**Robin van den Broek – *Mediobanca, Analyst***

… And the second question is around *secondary guaranteed universal life*. One of your peers in the U.S., I think **on the back of a private study, made some assumption changes in relation to that book**. I was just wondering if you could explain what that entails to and to what extent that could be a future action for yourselves? Thank you.

**Matt Rider – *Aegon Ltd., Chief Financial Officer***

Secondary guarantee.  So, for us, we review our assumptions in the second quarter, and we again reviewed lapse assumptions in this type of business. ***Based on our experience, we saw actually no reason to change them. And in fact, we have actually very low lapse rates amongst especially the sensitive blocks of business, where lapse rates tend to really matter***.  I think most people on the call would recognize that this is particularly sensitive for, one, older age population; two, higher [phase] amounts; and three, if contracts are in the money, then you can have very low lapse rates. And that's where we have actually quite granular modeling and have been routinely updating these assumptions over time. So that for those sensitive blocks of business, we have - they're very close to zero, very close to zero lapse rates. So this is not - *the lapse issue is something that we're routinely updating, but this is not an issue for us*.

108.    In the aftermath of Lincoln's massive charge, analysts again asked Aegon

management about their SGUL lapse assumptions on its November 10, 2022 call.  That exchange

went, in pertinent part, as follows:

**Michael Huttner – *Berenberg, Analyst***

And the last one is a question, I think, for reinsurance[].  So last week, I think **one of your peers** had a [EUR] $2.1 [] billion kind of **to me surprise announcement, maybe not for others, and I think a big reduction in solvency due to lapses**, which I think was the previous question. And I just wanted to kind of doubly confirm that I am

correct, there's no risk like that at Aegon that your lapse assumptions are near zero? Thank you.

**Duncan Russell – *Aegon Ltd., Chief Transformation Officer***

. . . . The other one that you had mentioned was that, yes, there was a company in the U.S. that had announced a significant charge as a result of revising lapse rate assumptions on secondary guarantee universal life contracts. And you are correct that it happened again second quarter. So we kind of see the same thing here. We are already operating under a granular lapse rate assumption where for the secondary guarantee universal life business. The business is quite sensitive to lapses specifically at the older ages, specifically with higher [face] amounts and specifically if the[y're] -- we say in the money. And in this case we are -- we have, let's say, over age 80, which is a very sensitive group. We have lapse rates that are less than 1% for policies that are aged 80 and over [USD] $1 million in face amount, our lapse rate is 0.5%. And if they're in the money, in other words, no account value but remaining to take premiums, which is particularly sensitive, we take a quarter of these levels. ***So, we are already at the most sensitive areas close to a zero lapse rate. So, this is something that we have taken care[] of over the years. And we continue to update it every second quarter. If there are changes, then we make them. But we're already on quite a granular lapse rate assumption***.

109.    Moreover, on Sun Life Financial's August 4, 2022 earnings call, its Chief Actuary explained why they did not envision any additional changes to Sun Life's GUL reserves and assumptions. That exchange went, in pertinent part, as follows:

**Gabriel Dechaine – *National Bank Financial Inc., Analyst***

While I got you, Kevin, one of your- well, the big U.S. life insurers booked a big reserve charge for lapse risk in the no-lapse guarantee business line that they're -- I don't think selling anymore. You've got it on your runoff block. Is there -- are you confident in those reserve levels? I believe you would have been more proactive over the years on identifying or reserving for those lapse[] trends?

**Kevin Morrissey – *Sun Life Financial, Chief Actuary & Senior Vice President***

Yes. That's right, Gabriel. As you know, ***we've been very keen to focus on that experience and make updates in the assumption reviews annually to make sure that we're -- got that right up to the most recent experience***. So last year, we did strengthen. We've been monitoring that since then. Happy to report that since that change last year. The experience has been fully in line with that last update. So certainly looking good over the last several quarters and ***we don't anticipate any further changes to the lapse assumption on that block***.

110.    Similarly, on Equitable Holdings Inc.'s November 3, 2022 earnings call, its CFO was asked why they were not taking a sizable charge.  That exchange went, in pertinent part, as follows:

**Nigel Dally – *Morgan Stanley, Analyst***

So low lapses have been an issue across the industry for individual life insurance. You did your actuarial review, there was very little impact.  So hoping you can provide some additional details there as to why ***your block is performing well, while other companies are taking sizeable charges***?

**Robin Raju – *Equitable Holdings, Inc., Chief Financial Officer***

Sure, Nigel.  I think it starts with the way Equitable has managed the business and position[ed] ourselves.  As you heard Mark and I mentioned earlier, ***we set assumptions based on emerging experience*** even if there's not creditability, we still believe that's appropriate because [] we believe to create trust in the industry and in Equitable.  ***We should avoid surprises for investors***.  And that's why you see Equitable's positive impact on assumptions updates in the quarter across of all our business, individual group and protection.  It includes any small [SGUL] exposure we have. So everything is set at emerging experience and that's intentional.  ***We think, avoiding surprises is a good thing for investors***. . . ."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

111.    The Class Period begins on December 8, 2021, when defendant Glass spoke on Lincoln's behalf at the Goldman Sachs U.S. Financial Services Conference.  During the conference, Glass spoke with an analyst about Lincoln's GUL business.  That exchange went, in pertinent part, as follows:

**Alexander Scott – *Goldman Sachs Group, Inc., Research Division - Equity Analyst***

I think you guys frequently get questions on interest rate risk and universal life insurance, I think is frequently, [where it goes] [] with concerns around interest rate risk and just if you could talk about that product, and I think you guys have talked a lot about the statutory impacts and so forth, but what gives you comfort in your individual life book and [UL] on the [face] of low rates?

**Dennis Robert Glass – *Lincoln National Corporation, President, CEO & Director***

Turns out collectively for the industry and for Lincoln that the interest rate assumptions used in pricing were higher than what we're experiencing today.  So on GUL, that manifest itself in part by spread compression.  And as I've just discussed,

we've got 8% to 10% earnings growth and have been effective at overcoming spread compression on the whole company, including the Life Insurance business and the GUL found in there. That's part of that. So that's an issue, and there's no easy answer to that.

But again, there are some questions in the industry about policyholder lapse assumptions. ***People are concerned that people will pay more premium for longer than what the pricing assumed***. ***We don't think so, but we'll have to see how that plays out over time***. So it's a big part of our life business. Again, in the aggregate spread compression is the near-term issue we're going to overcome that. And over time, we'll have to see how GAAP earnings are affected by this spread compression.

112.    The statement referenced in ¶111 above was materially false and misleading when made because Defendants misrepresented and/or failed to disclose that Lincoln's own recent internal experience around older age SGUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into Lincoln's policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates, which Defendants knew, or recklessly disregarded.

113.    On February 17, 2022, Lincoln filed the 2021 Form 10-K with the SEC for the fiscal year ended December 31, 2021, signed by defendants Glass and Freitag. In a section titled "Assumptions and Estimates," the 2021 Form 10-K stated, in relevant pertinent part, as follows:

The assumptions and estimates we use in connection with establishing and carrying our reserves are inherently uncertain. Accordingly, we cannot determine with precision the ultimate amount or the timing of the payment of actual benefits and claims or whether the assets supporting the policy liabilities will grow to the level we assume prior to payment of benefits or claims. ***If our actual experience is different from our assumptions or estimates, our reserves may prove to be inadequate in relation to our estimated future benefits and claims, which would adversely affect our financial position and results of operations***. In addition, increases in reserves have a negative effect on income from operations in the quarter incurred.

114.    The statement in ¶113 above in Lincoln's 2021 Form 10-K was materially false and misleading when made because by speaking about Lincoln's "actual experience" and its impact on reserves, it created a duty to disclose that Lincoln's "actual experience," around older age SGUL

policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into Lincoln's policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates, which Defendants knew, or recklessly disregarded.  In addition, the statement in ¶113 above was materially false and misleading when made because it misrepresented and failed to disclose that Lincoln's reserves could also "prove to be inadequate" based on industry-wide experience – and not just Lincoln's –  which Defendants knew, or recklessly disregarded.

115.    The 2021 Form 10-K further discussed Lincoln's SGUL products, stating, in pertinent part, as follows:

*UL Products with Secondary Guarantees*

We issue UL-type contracts where we provide a secondary guarantee to the contract holder.  The policy can remain in force, even if the base policy account value is zero, as long as contractual secondary guarantee requirements have been met.  The reserves related to UL products with secondary guarantees are based on the application of a benefit ratio the same as our GDB features, which are discussed above.  These secondary guarantees are reported within future contract benefits on our Consolidated Balance Sheets.  The level and direction of the change in reserves will vary over time based on the emergence of the benefit ratio and the level of assessments associated with the contracts.  During the third quarter of each year, we conduct our comprehensive review of the assumptions and projection models used in estimating these reserves and unlock assumptions similar to the DAC discussion above.  ***We may have unlocking in other quarters as we become aware of information that warrants updating assumptions outside of our comprehensive review***.  We may also identify and implement actuarial modeling refinements that result in increases or decreases to the carrying values of these reserves.

116.    The statement referenced in ¶115 above was materially false and misleading when made because it misrepresented and/or failed to disclose that Lincoln's own recent internal experience around older age SGUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into Lincoln's policyholders'

anticipated behavior patterns and lowered GUL policyholder lapse rates, which Defendants knew, or recklessly disregarded.

117.    On August 4, 2022, Lincoln held its 2Q22 earnings call.  During his prepared remarks, defendant Freitag spoke about Lincoln's capital position, balance sheet, and stock repurchases, in pertinent, part, as follows:

> Turning to capital and capital management.  We ended the quarter with $9.6 billion of statutory surplus and estimate our RBC ratio at approximately 400%, while cash at the holding company stands at $756 million.  The approximate 15-point sequential decrease in the RBC ratio was in line with our expectations and driven by weaker equity markets and noneconomic limitations on the deferred tax assets.  ***Taking into account the strength of our capital position,*** our high-quality investment portfolio and an improved view on potential credit losses, we intend to continue to repurchase our stock in the third quarter.  We look forward to getting together with you next month for a holistic discussion about the impacts of LDTI, not to front run that discussion as we continue to assess the impact, I will note that as of [630], we would currently expect to see only a modest impact from LDTI under total book value.  In closing, in the face of a challenging equity market environment, our second quarter earnings performance remained solid.  ***We are confident in our balance sheet and pleased to be continuing buybacks in the current market environment***.

118.    The statements in ¶117 above by defendant Freitag noting the "***strength of [Lincoln's] capital position***," and that "***[w]e are confident in our balance sheet and pleased to be continuing buybacks in the current market environment***" were materially false and misleading when made, because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statements were made:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information – showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)    that Lincoln's own recent internal experience around older age GUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided

Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates;

(c)    that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update, which would require the reserves on its balance sheet to be significantly increased and adversely impact its statutory capital; and

(d)    that, in light of the foregoing, Lincoln's balance sheet and capital position were not as defendant Freitag portrayed.

119.    During her prepared remarks, defendant Cooper commented on Lincoln's balance sheet and RBC level, stating, in pertinent, part, as follows:

> I will touch on the key strategic initiatives that have and will continue to drive results. . . .  Fourth, balance sheet resilience. As Randy will mention in his remarks, we did see a decline in our risk-based capital ratio in the quarter of about 15 points to approximately 400%, which was expected given the equity market downturn.  ***We maintain a solid balance sheet, including our high-quality investment portfolio and remain comfortable with our RBC level***.

120.    The statements in ¶119 above by defendant Cooper about Lincoln's "***solid balance sheet***" and that Defendants were "***comfortable with our RBC ratio***" were materially false and misleading when made, because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statements were made:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information – showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)    that Lincoln's own recent internal experience around older age GUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided

Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates;

(c)    that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update, which would require the reserves on its balance sheet to be significantly increased and adversely impact its statutory capital and RBC ratio; and

(d)    that, in light of the foregoing, the condition of Lincoln's RBC ratio and balance sheet were not as defendant Cooper portrayed.

121.    In the question-and-answer session of the earnings call, defendants Freitag and Cooper were asked about Lincoln's SGUL exposure and current lapse assumptions. That exchange went, in pertinent part, as follows:

**Erik James Bass – *Autonomous Research LLP, Partner of US Life Insurance***

Yes. And then my second question is just around your SGUL exposure. And I was hoping you could talk a little bit about your current lapse assumptions for the block and maybe provide any color on how they compared to the industry or maybe how they've changed over time?

**Randal Jay Freitag – *Lincoln National Corporation, Executive VP, CFO & Head of Individual Life***

Erik, thank you for the question. I think this question is probably more trying to get a third quarter assumption reviews. So let me take your question and expand and start with just. In general, Erik, our assumption review process is very robust. It's got a huge number of controls around it. There are a ton of really talented people that are involved in that process. I'm not going to front run that work. We'll go through our assumption review, and we'll talk about it on next quarter's call. So what I can tell you is that at a high level, the setting of assumptions is something that gets better, the more data you have, the talented people you have. And as a leading player in the life business, we have a lot of data. That data gets incorporated. We've been adjusting all of our assumptions every year reflecting that data.

We did participate in a study, an additional study this year. By the way, we do that all the time around assumptions, *but there was a particular study this year focused on GUL. We participated in that. So we have that study. And I'm sure the team will incorporate any new things they can learn from that process*.

[W]hen it comes to lapses, I'm not going to specifically discuss GUL, but I think there have been some things that have occurred over the last couple of years that have been discussed across the industry. So let's just remind ourselves of what those were. The pandemic raised in the minds of consumers, the value of life insurance. And almost immediately with the onset of the pandemic, you saw lapse rates fall across every product, every type of life insurance. And then after about 3, 4 quarters, you started to see them tick back up, and that's what you've seen. **They haven't recovered all the way back to pre pandemic levels, but they have come back up**. So at a high level, I think that -- hopefully, that gives you some context around what has been a pretty interesting couple of years in terms of lapse experience and how you should think about the future. For instance, will it recover back to pre-pandemic levels, will it level out at some point. I think those things all go into the pot. But Erik at a high level, we have a lot of data. We seek any data we can and we incorporate that into our assumptions every year.

122.    The statement in ¶121 above by defendant Freitag referencing the "particular study this year focused on GUL" was materially false and misleading when made, because, by speaking about the industry study, it created a duty to disclose: (i) that the industry GUL study – which Lincoln possessed at the time of this statement and for which Lincoln had collected and provided its own internal information – was an extensive study that showed lower GUL policyholder lapse rates, particularly with respect to older age policyholders; (ii) that the lowered industry GUL policyholder lapse rates rendered Lincoln's GUL lapse assumptions inadequate; and (iii) that Lincoln's inadequate GUL lapse assumptions would require the reserves on its balance sheet to be significantly increased, which Defendants knew, or recklessly disregarded.

123.    In addition, the statement in ¶121 above by defendant Freitag that lapse rates "**haven't recovered all the way back to pre pandemic levels, but they have come back up**" was materially false and misleading when made, because, by speaking about the Company's lapse rates in response to a question about Lincoln's "SGUL exposure" and "current lapse assumptions" it created a duty to disclose the following facts that Defendants knew, or recklessly disregarded:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information –

showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders; and

       (b)    that Lincoln's own recent internal experience around older age GUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates.

124.    Later on the 2Q22 earnings call, defendant Freitag was asked about Lincoln's statutory reserves for SGUL. That exchange went, in pertinent part, as follows:

**Thomas George Gallagher – *Evercore ISI Institutional Equities, Research Division, Senior MD***

Just -- just coming back to the SGUL question and how you're thinking about things now. And Randy, I'm not going to ask you to front run the balance sheet review. But I'm just trying to think about capital implications because PRU mentioned that their charge also result – GAAP charge also resulted in a corresponding statutory charge. I think in the past, you've indicated you feel very good about statutory reserves for SGUL. But I've always taken that to be an interest rate comment, not on mortality and lapse rates. So any -- what would you say about overall your current view of capital adequacy and potential impacts there because I -- if there is a GAAP balance sheet review charged and there were a statutory impact, I presume that would impact your ability to keep buying back stock. But anyway, long-winded question, but anything you could comment on would be appreciated.

**Randal Jay Freitag – *Lincoln National Corporation, Executive VP, CFO & Head of Individual Life***

Tom, a few comments. So I think about the topic. So statutory reserving is primarily formula-based and develops reserves at a high level are meant to be conservative, right? It's a solvency based reserving standard. ***So feel very good about that it's very supportive of the sufficiency of reserves***.

SGUL itself then has some separate tests, right? And we've talked about these over the years. they go by the monikers 8C and 8D. And those are the things that we've talked about in the past, where if we were to see any impact on statutory capital, it would have come through those subtests. You can go back, gosh, a number of years, and we talked about if rates drop to a certain amount, we saw a potential risk, which has declined over time, right? It's declined over time because the base reserves

continue to grow.  So inside of 8C and 8D, each test is a little different. But were syou to make big assumption changes. You do those inside those models also. So that can modestly impact those.

*But once again, at the end of the day, we've seen the potential impact from 8C and 8D decline over the time.  We haven't even talked about it for at least a year, near as I can remember.  So at a high level, we feel good about there*.  But the reality is in those tests, -- to the extent you change your assumptions about the future, you reflect those changes into those tests also.

125.    The statement in ¶124 above by defendant Freitag that they "*feel very good about…the sufficiency of reserves*" was materially false and misleading when made, because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statement was made:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information – showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)    that Lincoln's own recent internal experience around older age GUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates;

(c)    that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update, which would require the reserves on its balance sheet to be significantly increased and adversely impact its statutory capital; and

(d)    that, as a result of the foregoing, defendant Freitag had no reasonable basis to describe Lincoln's SGUL reserves as sufficient.

126.    Moreover, the statement in ¶124 above by defendant Freitag that "*we've seen the potential impact from 8C and 8D decline over the time.  We haven't even talked about it for at*

*least a year, near as I can remember.  So at a high level, we feel good about there*" was materially

false and misleading when made for the reasons set forth above in ¶125 and because, in light of the

lower lapse rates, the outcome of the SGUL actuarial subtests cited by defendant Freitag would be

adversely impacted, which Defendants knew, or recklessly disregarded.

127.    Defendant Freitag was then asked a follow-on question, in which he discussed

Lincoln's RBC ratio, in pertinent part, as follows:

> **Elyse Beth Greenspan – *Wells Fargo Securities, LLC, Research Division, Director & Senior Analyst***
>
> [W]hat are your expectations for dividends that you expect to take over the balance of the year?  And would that come from LNL or from the captive?
>
> **Randal Jay Freitag – *Lincoln National Corporation, Executive VP, CFO & Head of Individual Life***
>
> We took a dividend from LNBar back in the first quarter, I believe it was roughly $125 million.  In the second quarter, we took a dividend out of LNL of roughly $280 million.  So I think that we have plenty of dividend capacity. *We're very comfortable with where RBC is today*.

128.    The statement in ¶127 above by defendant Freitag that Defendants were "***very***

***comfortable with where RBC is today***" was materially false and misleading when made, because it

failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or

recklessly disregarded, at the time the statement was made:

(a)     that Lincoln was currently in possession of an extensive industry study

focused on GUL – for which Lincoln had collected and provided its own internal information –

showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)     that Lincoln's own recent internal experience around older age GUL

policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring

"age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided

Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates;

(c)    that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update, which would require the reserves on its balance sheet to be significantly increased and adversely impact its statutory capital and RBC ratio; and

(d)    that, in light of the foregoing, the condition of Lincoln's RBC ratio was not as defendant Freitag portrayed.

129.    Defendant Freitag was asked by another analyst about Lincoln's RBC ratio.  That exchange went, in pertinent part, as follows:

**Jamminder Singh Bhullar – *JPMorgan Chase & Co, Research Division, Senior Analyst***

…And then just lastly on RBC. Is there a level that you want to let it not go below? Like is [400] the base you'd want to keep it at?  Or how do you think about how far down would you be comfortable having a drop?

**Randal Jay Freitag – *Lincoln National Corporation, Executive VP, CFO & Head of Individual Life***

I think as Ellen and I mentioned*, **we're both very comfortable at 400 where we are today***.  Just a couple of additional points around that if this was last year, 400 would have been 420, right, because the C1 factors lowered at about 20 points, but didn't change the actual economics of how we think about appropriate capital.  ***So 400 this year is on a relative basis stronger than it would have been last year***.

The other sort of once again philosophy when we think about capital is -- and why we don't talk about a single target.  Philosophically, we believe that the right amount of capital is something that moves over time or the right RBC ratio is something that moves over time. At a very high level, immediately after a full-blown stress, we expect to be below our sort of average travel rate, right, maybe 50 to 70 points below.  And if you get it exactly right, the day before you have that full blown stress, you'll be probably 50 points or so above your average travel rate.  And so -- over time, we think about the right, I mean, I've got air quotes I'm making here in the room.  Number has been something that changed over time. ***But where we sit today, 400, I think we're very comfortable at that level***.

130.    The statements in ¶129 above by defendant Freitag regarding Lincoln's RBC ratio were materially false and misleading when made for the reasons set forth above in ¶128.

131.    The same day, August 4, 2022, Lincoln filed with the SEC its Form 10-Q reporting on the quarter ended June 30, 2022, signed by defendant Freitag (the "2Q22 Form 10-Q").  Among other things, the 2Q22 Form 10-Q discussed the Company's liquidity and capital resources, stating, in relevant pertinent part, as follows:

> We monitor and adjust our liquidity and capital plans in light of market conditions, as well as changing needs and opportunities.  ***Based on the sources of liquidity available to us as discussed below, we currently expect to be able to meet the holding company's ongoing cash needs and to have sufficient capital to offer downside protection***.

132.    The statement in ¶131 above discussing Lincoln having "sufficient capital to offer downside protection" was materially false and misleading when made, because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statement was made:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information – showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)    that Lincoln's own recent internal experience around older age SGUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates;

(c)    that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update, which would require the reserves on its balance sheet to be significantly increased and adversely impact its statutory capital; and

(d)      that, as a result of the foregoing, Lincoln's capital position was currently

impaired.

133.    On September 8, 2022, defendant Freitag spoke on behalf of Lincoln at the KBW

Insurance Conference.  The conference began, in pertinent part, as follows:

**KBW Analyst**

We're going to get going. Very pleased to have Lincoln with us today. And representing Lincoln is Randal Freitag, CFO; also, Al Copersino from Investor Relations.  **So, I'm just going to start with the topic everyone's been asking you about, I guess, we can now get over with at the beginning…  So let's start with the Universal Life or secondary guarantees**.  I know you're not going to front run the third quarter assumption review, as you like to say.  But I was hoping to at least get some perspectives on how -- on the assumption setting process, how it works and go from there.

**Randal Jay Freitag** *– Lincoln National Corporation, Executive VP, CFO & Head of Individual Life*

Okay, So you said it, I'll repeat it.  I'm not going to front run, what is a pretty robust process at Lincoln.  As you might imagine, there are literally scores of people involved in the process across our 4 businesses. At its core -- it's people who live and breathe these things, the people who do our experience studies all year long.  The people who participate in all the surveys we participate in who really do all the work. Ultimately, they make their -- do their analysis, bring that work to their respective business unit CFOs and ultimately bring forth to our Chief Actuary and our Chief Risk Officer, ultimately approve the new assumption sets for the year. In terms of what we look at, I don't think there's any surprise there.

We're a big company with a lot of data, so we look at trends in our own data.  And one of the things I mentioned on the call, for instance, last call was that in the life business with pandemic, we did see persistency go up or surrender rates go down. And while they've come back a little bit, they haven't come back all the way.  *So, we'll have to think about is that a short-term trend?  Is that a long-term trend -- we'll blend in information we get from outside sources, and we do participate in numerous studies over the course of the year, and I referenced one specifically focused on Guaranteed Universal Life that provides some new information, and we'll hand use that information*.  We'll blend that all together, do we see the world changing in the future?  Then is there anything we need to think about in that regard? And ultimately, that's what creates, what is our best estimate, set of assumptions that we'll talk about on our third quarter call.

134.    The statement in ¶133 above by defendant Freitag about a study "**specifically focused on Guaranteed Universal Life that provides some new information**" was materially false and misleading when made, because, by speaking about the industry study, it created a duty to disclose: (i) that the industry GUL study – which Lincoln possessed at the time of this statement and for which Lincoln had collected and provided its own internal information – was an extensive study that showed lower GUL policyholder lapse rates, particularly with respect to older age policyholders; (ii) that the lowered industry GUL policyholder lapse rates rendered Lincoln's GUL lapse assumptions inadequate; and (iii) that Lincoln's inadequate GUL lapse assumptions would require the reserves on its balance sheet to be significantly increased, which Defendants knew, or recklessly disregarded.

135.    Also at the conference, defendant Freitag was asked about Lincoln's cash flow testing for its GUL book.  That exchange went as follows:

**KBW Analyst**

And can you give any sense or I know at least directionally, just how strong your cash flow testing margins would have been in the GUL book when you did it last time.

**Randal Jay Freitag – Lincoln National Corporation, Executive VP, CFO & Head of Individual Life**

Yes, if you go back, gosh, all 7, 8 years, we used to talk about -- back then, we were at a very low rate environment.  We would talk about if the 10-year treasury went to 50 basis points and stayed there forever.  We saw up to $600 million to $700 million of additional reserves that we would need to put up.  And then we've talked about over the years as the base reserves have built up that, that's one away. ***And in fact, we've sort of come out of the negative situation and we've built up some level of sufficiency inside of those 2 subtests.  So, I feel good about the sufficiency***, -- but obviously, whatever assumptions we do for our GAAP process will reflect in our statutory models.  So, we don't have this set of assumptions over here and this set of assumptions over there. If we make changes, we reflect them across the company in all of the different areas where we need models, including the subtest for GUL.

136.    The statement in ¶135 above by defendant Freitag that Lincoln had "***sort of come out of the negative situation and we've built up some level of sufficiency inside of those 2 subtests. So, I feel good about the sufficiency***" was materially false and misleading when made, because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statement was made:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information – showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)    that Lincoln's own recent internal experience around older age SGUL policyholders and longer policy durations – including, Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates;

(c)    that, as a result of the lower lapse rates, the outcome of the SGUL actuarial subtests cited by defendant Freitag would be poor, the reserves on Lincoln's balance sheet would need to be significantly increased, and its statutory capital would be adversely impacted; and

(d)    that, in light of the foregoing, defendant Freitag had no reasonable basis to describe Lincoln's SGUL reserves as sufficient.

137.    On September 14, 2022, defendant Cooper spoke on behalf of Lincoln at the Barclays Global Financial Services Conference.  During the conference, Cooper was asked about the impact of Lincoln's annual assumption review.  That exchange went, in pertinent part, as follows:

**Al Grismer – *Millennium, Analyst***

It's good to hear you reiterate your EPS growth target, and you mentioned some of the drivers. But I also think capital return is an element of that.  And there - on the last quarter call, there was some concern around an assumption review that you're

doing this quarter.  And so if you could just provide some insight into how the potential impact of that and what it could do for capital return next year?  Or if you are confident in that guide that there's not going to be some drag or impact from the assumption review, if you could talk about that. I think it would be helpful.

**Ellen Gail Cooper – *Lincoln National Corporation, President, CEO & Director***

So you all know that -- and you've heard us talk about this that we cannot speak to third quarter or third quarter unlocking inter-quarter.  So what I can share with you is that just like we do every year, we're in the middle of our overall assumption review process. It's a process internally that starts with our actuaries. And part of what our actuaries are doing is they are reviewing our own experience. They also will look at any industry experience as well that could potentially be additive to that.

And you have heard and you know that we did participate in the industry study that was cited on one of our competitors in terms of that negatively impacting their overall results.  ***That would simply be an input for us as would many other factors as we look at overall experience***.  And we're looking at a broad range of as we do every year of our policyholder behavior, so that's our mortality, our morbidity, our lapse assumptions, our capital market assumptions.  And we will look at that and determine whether or not based on the best estimate, there's a need to make any changes to the overall assumptions and whether or not that would impact us on the GAAP side.

Now in particular, the place where we know that a competitor took a write-down in the second quarter because they do second quarter unlocking. And they talked about the fact that when they look from GAAP to STAT that they were expecting from a capital perspective to see a 1-for-1 impact.  So for us, when we look -- first of all, when we translate assumptions from GAAP to STAT, the assumption STAT, if we believe that lapses and the experience go forward for lapses should change, it would be consistent.  The assumption change in and of itself would be consistent from GAAP to STAT.  GAAP reserves and the GAAP process is set based on best estimates, statutory reserve process is different.  On STAT, first of all, there are base reserves, and those base reserves are basically set and they would not at all be altered by any assumption setting process.

Additionally, there are a couple of tests that need to occur on the statutory side on an annual basis. One is adequacy testing, that's cash flow testing. And so that's an aggregate test.  ***And then there are also specific tests for portions of the GUL business, and that's an 8C and an 8D test. For us, these particular subtests, 8C, and 8D, which would utilize assumptions and be projection based. Last year, when we looked at those tests, we had a cushion there. And with interest rates being higher than they were a year ago, we would expect that there would be even more of a cushion as a result of higher capital market environment***.  So I want to give that to you as a backdrop and then our expectation of what we believe at this point in terms of the overall capital return as it relates to that overall EPS growth.  We'll be able to share more of that with you as well in our third quarter call.  But we do have

assumptions, of course, that are inside of that EPS growth that are getting us to that 8% to 10%.

138.    The statement in ¶137 above by defendant Cooper – made with just two weeks remaining in 3Q22 – that the industry study "*would simply be an input for us as would many other factors as we look at overall experience*" was materially false and misleading when made, because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statement was made:

(a)    that the GUL industry study – which Lincoln possessed at the time of this statement and for which Lincoln had collected and provided its own internal information – was an extensive industry study showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders; and

(b)    that, given the extent of the study's findings of lower GUL policyholder lapse rates, which had been available to Defendants for several months, it was misleading to downplay its significance to Lincoln's overall assumption review.

139.    In addition, the statement in ¶137 above by defendant Cooper that they "*expect that there would be even more of a cushion*" in Lincoln's SGUL reserves from the prior year after conducting the Section 8C and 8D actuarial subtests, was materially false and misleading when made, because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statement was made:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information – showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)    that Lincoln's own recent internal experience around older age SGUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring

"age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates; and

(c)     that, as a result of the lower lapse rates, the outcome of the SGUL actuarial subtests cited by defendant Cooper would be adversely impacted such that there would be no "cushion" with respect to Lincoln's SGUL reserves.

140.     Defendant Cooper was also asked by a Barclays analyst about Lincoln's RBC ratio. That exchange went, in pertinent part, as follows:

**Tracy Dolin-Benguigui – *Barclays Bank PLC, Research Division, Director & Senior Equity Research Analyst***

Okay. Interesting. Maybe turning to capital management, your RBC. Can you just discuss the factors that led Lincoln's buffer to be depleted in the second quarter? I think your RBC now is at the 400% level, which is your target.

**Ellen Gail Cooper – *Lincoln National Corporation, President, CEO & Director***

Yes.  So first of all, as it relates to our target, importantly, we ended the quarter at 400 RBC.  About a year ago, we had the C1 factor RBC change.  And for us, although there was no impact to our overall credit risk, to our overall view of the investment portfolio, it was a 20-point impact for us. So we really view that the 400 that we had at the end of the quarter was effectively 420 a year ago.  So we believe that we still have some room in terms of our overall target is the first thing.  The second thing is that we did experience 30 points of RBC impact in the first half of the year, exactly to your point.

\*          \*          \*

**Tracy Dolin-Benguigui – *Barclays Bank PLC, Research Division, Director & Senior Equity Research Analyst***

Okay. Can you just put a little bit more context over the range and as well as discuss how important it is to Lincoln to have an R[B]C buffer?

**Ellen Gail Cooper – *Lincoln National Corporation, President, CEO & Director***

***Yes. So as I mentioned, we would be comfortable with the 400 RBC, which was -- which, in our eyes, was a 420 RBC, and going to the 380 RBC.***  And then we also do a lot of stress testing and stress scenario analysis to ensure that the target level has

to be correlated and connected to being able to withstand a severe stress and maintaining lower RBC levels but lower RBC levels that support potential significant credit risk, equity market, additional equity market decline, et cetera, with an objective of not reducing shareholder dividends, with not needing to do any capital or equity raise of any sort and being able to continue to operate sales as we typically would. So if we are feeling -- and also maintaining, of course, strong financial strength ratings. *So if we're able to maintain all of that from a severe stress perspective, we also are comfortable in terms of our overall targets*.

141.    The statements in ¶140 above by defendant Cooper about Lincoln's RBC ratio were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statements were made:

(a)    that Lincoln was currently in possession of an extensive industry study focused on GUL – for which Lincoln had collected and provided its own internal information – showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders;

(b)    that Lincoln's own recent internal experience around older age GUL policyholders and longer policy durations – including Lincoln's own in-depth GUL study measuring "age 75+ policies that have faced a 'minimum fund or lapse' decision" – had already provided Defendants with deep insight into its policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates;

(c)    that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update, which would require the reserves on its balance sheet to be significantly increased and adversely impact its statutory capital and RBC ratio; and

(d)    that, in light of the foregoing, the condition of Lincoln's RBC ratio was not as defendant Cooper portrayed.

142.    On November 2, 2022, Defendants revealed that Lincoln had taken a $2.197 billion charge – *$1.8 billion* of which was primarily a direct result of updates to its GUL policyholder lapse

assumptions. *See supra* ¶¶79-83. In reaction to these and other announcements by Defendants, the price of Lincoln common stock fell ***33.14%,*** on November 3, 2022 and an additional ***4.5%*** over the next two trading days. *See supra* ¶¶99, 101.

## RELEVANT POST-CLASS PERIOD DEVELOPMENTS

143. The fallout from Defendants' revelations about Lincoln's massive nearly $2 billion GUL-related charge and poor capital position was extensive. A series of events took place over the next weeks and months revealing the significant problems Lincoln actually faced.

144. First, just two weeks after the Class Period, on November 15, 2022, Lincoln announced it was conducting a ***$1 billion*** preferred stock offering. The Company stated that it intended to use the offering proceeds to fund part of a repayment of certain Notes due in September 2023 and "for general corporate purposes." Defendant Cooper claimed that the issuance would provide Lincoln with a "cushion" against potential macroeconomic uncertainty, adding that the offering would "effectively add an additional 30 points" to its newly-reduced RBC ratio.

145. Then, at a December 7, 2022 industry conference, Cooper revealed that as a direct result of Lincoln's beleaguered capital position, the Company was "***pausing share buybacks through the end of 2023***." Cooper elaborated that Lincoln was "focused on targeted actions to ***repair the balance sheet***." Analysts from Wells Fargo covering the conference reported that Lincoln "gave additional color on challenged capital generation and its plan to rebuild its RBC ratio" and noted that Lincoln was "now working toward repairing its balance sheet and restoring RBC[.]" The next day, the *Philadelphia Business Journal* reported that Lincoln would "pause stock buybacks through 2023 as a plan to deal with ***financial challenges*** in the wake of a disastrous $2.6 billion third quarter loss[.]"[13]

---

[13]    Jeff Blumenthal, *Lincoln Financial CEO says stock buyback to be paused through 2023 amid financial headwinds*, PHILADELPHIA BUSINESS JOURNAL (Dec. 8, 2022),

146.    Next, on February 8, 2023, Lincoln announced that defendant Freitag – Lincoln's longtime CFO and the person in charge of its entire Life Insurance business – was "leaving the company." Following the announcement, analysts from Wells Fargo commented that "LNC's long-standing CFO stepped down following a year of messy results at the company, and it remains free cash flow and capital constrained."

147.    Finally, on May 2, 2023, Lincoln announced that it had agreed to a $28 billion reinsurance transaction with Fortitude Re.[14]    Lincoln's new CFO, Christopher Neczypor ("Neczypor"), explained that the $28 billion reinsured block was comprised of "$9 billion of universal life with secondary guarantee reserves, representing about 40% of Lincoln's ULSG in-force."

148.    In other words, Lincoln was transferring the risk of **40%** of its entire in-force SGUL book to another company. CFO Neczypor lauded that the transaction "significantly reduces our exposure to universal life with secondary guarantees." Defendant Cooper added that the deal "improves the risk profile of the balance sheet. It frees up capital on day 1, and it increases ongoing free cash flow, particularly in the life insurance business."

149.    Neczypor elaborated on the extent to which Lincoln's GUL block was impacting its free cash flow stating, in pertinent part, as follows:

> Ellen has been discussing the negative free cash flow that we've been dealing with in our life business for the past couple of quarters, right? And so the main product there is the GUL block. Look, it's a challenging block for both us and the industry, as

https://www.bizjournals.com/dallas/bizwomen/news/latest-news/2022/12/lincoln-financial-pauses-stock-buybacks.html.

[14]    Reinsurance is essentially insurance for insurance companies. Through reinsurance, an insurance company transfers some of the financial risk that the insurance company normally assumes, to another insurance company.

we've talked about at length, right? The cash flow strain is really due to a combination of low interest rates and with persistency and mortality pressures that have been building up over time, leading to additional reserve buildup. And so it's a very capital-intensive business with a negative cash flow outlook over the next few years. And so that's the main drag as it relates to the free cash flow. So by ceding that, you're removing a negative.

150. According to analysts from UBS, the reinsurance transaction was "a positive step towards improving LNC's capital position, but the transaction is dilutive to earnings (expected) and *there is still more work to do before LNC reaches its near term targeted 400% RBC ratio and fully strengthens its capital position following the $2.1b charge the company took in 3Q22*."

### ADDITIONAL SCIENTER ALLEGATIONS

### The Individual Defendants Controlled the Company's Messaging to the Investing Public

151. As alleged herein, the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

152. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of Lincoln's allegedly materially false and misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lincoln, were active and culpable participants in the fraudulent scheme alleged herein.

153. The Individual Defendants knew, or recklessly disregarded, the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without

the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including defendants Cooper, Glass, and Freitag.

154.    The Individual Defendants, by virtue of their high-level positions within the Company during the Class Period – as Chief Executive Officers (Cooper and Glass), and Chief Financial Officer (Freitag) – directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and final condition, as alleged herein.  The Individual Defendants, because of their positions within Lincoln, controlled the content of the Company's public statements during the Class Period.

155.    In drafting, reviewing or commenting on press releases and SEC filings, and preparing for conference calls and investor presentations, the Individual Defendants were either already knowledgeable, became knowledgeable, or recklessly disregarded the underlying facts that they had access to regarding, *inter alia*, Lincoln's GUL reserves, lower GUL policyholder lapse activity, and the Company's capital position.

### The Individual Defendants' Numerous and Specific Statements During the Class Period Regarding Lincoln's Assumption Review Support a Strong Inference of Scienter

156.    During the Class Period, Lincoln's actuarial assumption review for its SGUL block was, as described by an analyst to defendant Freitag, "***the topic everyone's been asking you about***." Indeed, although Defendants claimed that they "cannot speak to third quarter or third quarter unlocking inter-quarter," they nonetheless proceeded to make repeated and specific statements about this issue to investors.

157.    This includes, *inter alia*, defendant Cooper telling investors, with just two weeks remaining in 3Q22, that they "***would expect that there would be even more of a cushion***" from the

results of the specific actuarial subtests applying to SGUL reserves.  Likewise, defendant Freitag declared that "*we've built up some level of sufficiency inside of those 2 [actuarial] subtests*."

158.    In addition, defendants Cooper and Freitag readily discussed the GUL industry study, including by telling investors three months before Lincoln's 3Q22 earnings call that "*there was a particular study this year focused on GUL.  We participated in that. So we have that study*."

159.    These and other numerous and specific statements reflect that the Individual Defendants were receiving – or had access to – specific information regarding Lincoln's actuarial assumption review, and in particular, its GUL reserves.  In addition, the fact that several of Defendants' false and misleading statements were scripted, and were reviewed by Company executives before they were made, shows that the statements were premeditated.

160.    Defendants had multiple opportunities to prevent their materially false and/or misleading statements from being made, or to cause them to be corrected – but did not – which underscores their scienter.  The only plausible inference that can be drawn from Defendants' many pronouncements about Lincoln's assumption review, the relevant actuarial subtests, and the industry study, is that the Individual Defendants either fabricated the information they provided to investors and the market or they deliberately ignored information they possessed or had access to relating to such matters.  In either event, such recklessness satisfies the scienter requirement.

### Lincoln's "Very Robust" Assumption Review Process, Which Included Its Own "In-Depth GUL Study" Covering the Relevant Period, Supports a Strong Inference of Scienter

161.    Insurance companies go through comprehensive processes and analyze copious amounts of data in order to set the most accurate assumptions as possible.

162.    Defendants themselves described the magnitude of Lincoln's own process for its annual actuarial assumption review during the Class Period.  In response to a question about Lincoln's SGUL exposure on its August 4, 2022 earnings call, defendant Freitag explained that the

Company's "**assumption view process is very robust. It's got a huge number of controls around it. There are a ton of really talented people that are involved in that process**." Freitag went on to state that "as a leading player in the life business, **we have a lot of data**. That data gets incorporated. We've been adjusting all of our assumptions every year reflecting that data. . . . **We seek any data we can and we incorporate that into our assumptions every year**."

163.    Defendant Freitag further highlighted Lincoln's "robust" assumption review process at the September 8, 2022 KBW Insurance Conference, by telling an analyst that "**there are literally scores of people involved in the process across our 4 businesses. . . .[I]t's people who live and breathe these things, the people who do our experience studies all year long.** The people who participate in all the surveys we participate in who really do all the work." Freitag further described that when setting Lincoln's assumptions, "**[w]e're a big company with a lot of data, so we look at trends in our own data**. . . ."

164.    Likewise, at the September 14, 2022 Barclays conference, defendant Cooper reiterated Lincoln's comprehensive internal process for its annual reserve review. Cooper stated: "part of what our actuaries are doing is they are reviewing our own experience. They also will look at any industry experience as well that could potentially be additive to that." Cooper confirmed "we're looking at a broad range [] as we do every year of our policyholder behavior, so that's our mortality, our morbidity, our lapse assumptions, our capital market assumptions."

165.    As set forth herein, a significant amount of the data used in the assumption setting process is internal. For example, in 2017, the Society of Actuaries conducted a survey titled "Universal Life with Secondary Guarantees Survey" in which 25 insurance companies – including Lincoln Financial Group – participated. Among other things, the survey collected information from

the 25 companies on their assumptions used in their SGUL modeling. As shown in the below slide from the survey, the primary source for setting base lapse rate assumptions was company experience:



166.    Indeed, Lincoln conducted its own internal study monitoring GUL policyholder behavior. As revealed in a footnote to a slide accompanying the Company's November 2, 2022 Form 8-K, Lincoln conducted its own "***in-depth GUL study***," covering, at a minimum, 2019 through 2022. According to Lincoln, the study measured, *inter alia*, "age 75+ policies that have faced a 'minimum fund or lapse' decision[.]"

167.    As defendant Cooper explained, "[o]ver the last several years, as Lincoln's GUL policy experience has materialized, it has provided deeper insights into anticipated behavior patterns in later policy durations. . . ." Cooper also described the charge being "primarily due to updated lapse assumptions where emerging Lincoln [GUL] experience was validated this year by new industry perspectives." In addition, defendant Freitag detailed that Lincoln's updated assumptions were based, in part, on "a deep dive into our experience[.]"

168.     Moreover, shortly following the Class Period, defendant Cooper expanded on the extent to which Lincoln's own internal data led to the Company taking the nearly $2 billion charge, stating, "*in terms of our own internal experience around older ages and longer policy durations, our experience in the last couple of years had more than doubled to support what we were seeing*."

**Defendants' Access to the GUL Industry Study *at Least* Six Months Prior to Announcing Lincoln's Updated Lapse Assumptions Supports a Strong Inference of Scienter**

169.     On information and belief, the GUL industry study was in Lincoln's possession as of May 4, 2022, at the absolute latest – *i.e.*, the date Prudential publicly acknowledged possession of the study, in which it similarly participated.

170.     As such, Defendants had access to the GUL industry study – providing "7x the amount of information than what [they] had had just a couple of years prior" and which "gave [Defendants] the amount of data to understand how policyholders should be expected to behave in the future" at least *six months* before announcing Lincoln's updated lapse assumptions in November 2022.

171.     Consequently, Defendants made a multitude of statements to investors during the Class Period regarding, *inter alia*, Lincoln's SGUL reserves and the related actuarial subtests, while they **already had access** to the very source of information on which they largely based Lincoln's updated SGUL lapse assumptions.

172.     Moreover, as set forth above, upon Prudential's May 4, 2022 announcement of receiving the industry study, its CFO, at least preliminary, was able to review the study's contents and warned that it "*indicates experience is more adverse in some of [our] assumptions of our US life insurance business*."  This statement – by one of Lincoln's primary competitors about the same GUL study in which Lincoln collected information and participated – should have been a red flag for Defendants regarding the GUL study's findings.  Indeed, Defendants were well aware of the study's

impact on Prudential, with defendant Cooper confirming during the Class Period that Lincoln "did participate" in the same study cited by Prudential "*in terms of that negatively impacting their overall results*."

173.    These facts, in conjunction with the additional indicia of scienter detailed herein, collectively support a strong inference of scienter for each of the Individual Defendants.

## Corporate Scienter

174.    The allegations herein also establish a strong inference that Lincoln acted with corporate scienter because the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts, or were reckless in failing to ascertain and disclose these material facts, despite such facts being at their disposal.  By purposely or recklessly concealing Lincoln's true financial state from investors, the Company maintained and/or increased its artificially inflated common stock price throughout the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

175.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lincoln common stock and operated as a fraud or deceit on Class Period purchasers of Lincoln common stock by misrepresenting the value of the Company's business and prospects in the Company's operations.

176.    When the relevant truth became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of Lincoln common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock.  As a result of their purchases of Lincoln common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

177.    On November 2, 2022, after the market closed, Lincoln issued a press release announcing a net loss of *$2.6 billion* for 3Q22 related to the Company's reserve assumptions.  The charge resulted in a *$550 million statutory capital impact* and a *22-point decline* in its RBC ratio.  Defendant Cooper stated, "[t]he significant charge we recorded during the third quarter and the statutory capital impact to be booked at the end of 2022 resulted from our annual assumption review primarily due to policyholder lapsation behavior in our [GUL] insurance block and will contribute to a decline in our RBC ratio."

178.    The next morning, on November 3, 2022, Defendants held the Company's 3Q22 earnings call and filed the Company's 3Q22 Form 10-Q, in which Defendants elaborated on the announcements made in the press release Lincoln issued the prior evening.  *See* ¶¶84-91.

179.    The information disclosed on November 2 and November 3, 2022 was both related to and the foreseeable consequence of the relevant truth that Defendants misrepresented and concealed from investors during the Class Period – namely that Lincoln's GUL reserves were wholly insufficient, the relevant industry study carried far more weight than portrayed, and the Company did not have the capital strength Defendants had conveyed to the investing public.

180.    As a direct and proximate result of these announcements, concealed by Defendants' fraud, the price of Lincoln common stock suffered its *worst stock price decline in more than 15 years*, plummeting *33.14%*, from $52.10 per share on November 2, 2022 to a close of $34.83 per share on November 3, 2022 – a $17.27 per share decline – the next trading day, on a high trading volume of over 9.8 million shares trading, over 6 times greater than the average daily trading volume during the Class Period, and eviscerating $2.9 billion in market capitalization.

181.    Over the next two trading days, the market continued to digest Lincoln's November 2 and November 3, 2022 disclosures and the price of Lincoln common stock fell another 4.5%, from

its closing price on Thursday, November 3, 2022 of $34.83 per share, to close at $33.26 per share on Monday, November 7, 2022.

182.    The stock price declines immediately following the November 2 and November 3, 2022 disclosures were substantially, if not wholly, caused by the revelation of the relevant truth and/or the materializations of the risks that Defendants fraudulently concealed.

183.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lincoln common stock and operated as a fraud or deceit on Class Period purchasers of Lincoln common stock by misrepresenting the value of the Company's business and prospects in the Company's operations.

## NO SAFE HARBOR

184.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the company making the statement who knew that those statements were false or misleading when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

185.    At all relevant times, the market for Lincoln common stock was an efficient market for the following reasons, among others:

(a)    Lincoln stock met the requirements for listing, and its common stock was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for the fiscal year ended December 31, 2023, Lincoln had over 169 million shares of its common stock outstanding as of February 16, 2024;

(c)    as a regulated issuer, Lincoln filed periodic public reports with the SEC; and

(d)    Lincoln regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and unexpected material news about Lincoln was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

186.    As a result of the foregoing, the market for Lincoln common stock promptly digested current information regarding Lincoln from publicly available sources and reflected such information in the price of Lincoln common stock.  Under these circumstances, all purchasers of Lincoln common stock during the Class Period suffered similar injury through their purchases of Lincoln common stock at artificially inflated prices, and a presumption of reliance applies.

187.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Lead Plaintiff's claims are based, in part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Lincoln's business,

operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

188.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Lincoln common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

189.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lincoln common stock actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lincoln or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

190.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

191.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

192.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented and/or omitted material facts about the business and operations of Lincoln; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

193.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

194.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

195.     During the Class Period, Defendants disseminated or approved the statements specified above, which they knew, or deliberately disregarded, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

196.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Lincoln common stock during the Class Period.

197.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lincoln common stock.  Lead Plaintiff and the Class would not have purchased Lincoln common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

198.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

199.    The Individual Defendants, and/or persons under their control, violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to Lead Plaintiff and the other members of the Class.  By virtue of their positions as controlling persons, each of these defendants is liable pursuant to Section 20(a) of the Exchange Act for the acts and omissions of their co-defendants in violation of the Exchange Act.

200.    Each of these defendants acted as a controlling person of some or all of their co-defendants, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws.  Each of the Individual Defendants

had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of, and contractual rights with, Lincoln, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action is a proper Class action, designating plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

DATED:  December 23, 2024          SAXTON & STUMP, LLC


                                    /s/ Lawrence F. Stengel
                                   _____
                                   LAWRENCE F. STENGEL
                                   PA Attorney I.D. #32809
                                   280 Granite Run Drive, Suite 300
                                   Lancaster, PA  17601
                                   Telephone:  717/556-1080
                                   lfs@saxtonstump.com

                                   *Local Counsel*

                                   ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   SAMUEL H. RUDMAN (admitted *pro hac vice*)
                                   DAVID A. ROSENFELD (admitted *pro hac vice*)
                                   ROBERT D. GERSON (admitted *pro hac vice*)
                                   NATALIE C. BONO (admitted *pro hac vice*)
                                   58 South Service Road, Suite 200
                                   Melville, NY  11747
                                   Telephone:  631/367-7100
                                   631/367-1173 (fax)
                                   srudman@rgrdlaw.com
                                   drosenfeld@rgrdlaw.com
                                   rgerson@rgrdlaw.com
                                   nbono@rgrdlaw.com

                                   *Lead Counsel for Lead Plaintiff*