IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONALD C. MEADE,** *Individually and on Behalf of All Others Similarly Situated* : | CIVIL ACTION |
| v. : | NO.  24-1704 |
| **LINCOLN NATIONAL CORPORATION,** *et al.* : | |

MEMORANDUM

**MURPHY, J.**                                                                                                                July 24, 2025

      This proposed securities class action targets Lincoln National Corporation's statements before a precipitous third-quarter loss in 2022.  That quarter, Lincoln reported a $2.6 billion net loss, largely driven by revised assumptions about certain life insurance policies.  Investors claim Lincoln saw the trouble coming but kept the market in the dark, offering misleading reassurances instead.  They point to internal data and an industry study indicating that older policyholders were holding onto their policies longer than expected — a trend that would have significantly increased Lincoln's reserve obligations and worsened its financial position.  And that's exactly what happened.

      But hindsight alone doesn't support a securities fraud claim, and not every sudden loss is actionable.  Such claims face strict pleading standards.  Lincoln moves to dismiss, arguing that the complaint fails to show that it held information so clearly adverse that its public statements were misleading when made.  Examining the complaint under the high-magnification lens prescribed by the Third Circuit, we agree.  The complaint does not sufficiently allege what data Lincoln had at the time of each alleged statement, undermining any inference of fraudulent intent.  As a result, it falls short of the demanding bar for securities fraud cases.  We grant Lincoln's motion to dismiss, with leave for investors to amend their complaint.

I.       Background

This is a class action under the Securities Exchange Act of 1934 related to the sale of Lincoln National Corporation (Lincoln) securities. The case began in April 2024, when Donald C. Meade filed a class action complaint against Lincoln and three of its executives, Ellen Cooper, Dennis Glass, and Randal Freitag. DI 1. Pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA), we appointed Local 295 IBT Employer Group Pension Trust Fund (Local 295) — a multiemployer pension plan with the largest financial interest in the relief sought — to represent the class as lead plaintiff. DI 25. On December 23, 2024, Local 295 filed an amended complaint, DI 35, and Lincoln moved for dismissal, DI 40. Local 295's allegations are described below.

A.    Background on life insurance.

Lincoln sells life insurance. DI 35 ¶ 2. Relevant here is Lincoln's sale of guaranteed universal life insurance (GUL) policies, which focus on death benefits, meaning they offer "lifelong coverage and a guaranteed death benefit in exchange for a fixed premium," but "accumulate negligible — if any — cash value for the policyholder during their lifetime." *Id.* ¶ 32. If a policyholder fails to pay their premium, their policy lapses and is no longer in effect. *Id.* ¶ 33. That means the insurer does not have to pay out a death benefit to a lapsed policyholder, even if the policyholder had paid for years. *Id.* ¶¶ 33-34. Accordingly, lapsed policies are "a source of financial gain" for life insurance companies. *Id.* ¶ 34. The higher the lapse rate, the greater the insurer's financial gain. Relatedly, lapse rates affect the amount of "reserves," or "capital" that state regulators require insurance companies to set aside to "pay claims as they become due." *Id.* ¶¶ 3-4. When "more policies remain[] in effect" (i.e., lapse

2

rates are low), insurers must "increase their reserves to account for eventually paying out those additional policies." *Id.* ¶ 4.[1]

Lincoln offers some no-lapse policies — policies with secondary guarantees (SGUL) — that stay "intact with minimal upkeep from the policyholder." *Id.* ¶ 35.  In other words, policyholders maintain coverage so long as they "pay[] the minimum premium amount or fund[] the policy to a specified value" even if the "cash value of that policy drops to zero." *Id.*  Some of these plans "are designed with cash value growth linked to specific market indices or mutual fund growth," which "can reduce the insurance company's cost of funding death benefits." *Id.*  But when the market has low interest rates, insurers get less interest income from investing policyholders' premiums. *Id.* ¶¶ 37-38.  In the years preceding the class period, "extremely low interest rates proved problematic for life insurance companies, particularly with respect to SGUL policies." *Id.* ¶ 38.

Insurers take into consideration lapse and interest rates to determine how much capital they must designate for reserves. *Id.* ¶ 45.  This process happens during "annual assumption reviews," though insurers may conduct assumption reviews more frequently. *Id.* ¶ 45.  If an insurer's assumption review reveals the need to revise assumptions, the insurer will engage in an "unlocking process" where it may increase reserves — called "taking a charge" — or release reserves. *Id.* ¶ 47.  During the unlocking process, internal actuaries evaluate the reserves under

---

[1] Insurance regulators also monitor the insurer's risk-based capital (RBC), which establishes a de facto minimum level of required capital. DI 35 ¶ 42. "Insurance companies are required to maintain RBC levels at certain percentages, which assures that the company has sufficient assets to protect against potential risks." *Id.* ¶ 43. Lincoln purportedly considers the RBC ratio as a "primary measure of the capital adequacy" and an "important factor" to determine its financial strength. *Id.* ¶ 44.

3

various scenarios, in part to ensure compliance with statutory minimum reserves. *Id.* ¶ 49.

### B. Statements before competitors acted.

During the Covid-19 pandemic, "more life insurance policyholders were keeping their policies active," so lapse rates were low. *Id.* ¶ 52. This meant lower profits and higher reserves requirements. *Id.* ¶¶ 4, 52. As time passed from onset of the pandemic, the industry queried what would happen with lapse rates, *id.* ¶ 54: would policyholders begin lapsing again, or would they continue to keep their policies active? What would that mean for insurers' annual assumption review process — would insurers take large charges to increase reserves?

On December 8, 2021, the start of the class period, defendant Glass discussed interest rate assumptions at a conference and stated "[p]eople are concerned that people will pay more premium for longer than what the pricing assumed [therefore not lapsing]. We don't think so, but we'll have to see how that plays out over time." *Id.* ¶ 111. Local 295 says this was false or misleading because Lincoln knowingly or recklessly disregarded internal data that provided "deep insight into Lincoln policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates." *Id.* ¶ 112.

In February 2022, Lincoln filed its 2021 Form 10-K with the SEC, which stated "[i]f our actual experience is different from our assumptions or estimates, our reserves may prove to be inadequate in relation to our estimated future benefits and claims, which would adversely affect our financial position and results of operations." *Id.* ¶ 113. Local 295 argues that this was false or misleading for the largely the same reason as defendant Glass's December 8th statement — Lincoln allegedly had information about anticipated lowered lapse rates, which it recklessly disregarded. *Id.* ¶ 114. The Form 10-K also stated "[w]e may have unlocking in other quarters

4

as we become aware of information that warrants updating assumptions outside of our comprehensive review," which Local 295 argues was false or misleading for the same reason as above.  *Id.* ¶¶ 115-16.

### C. Prudential takes charge because of decreased lapse rates.

On May 4, 2022, the CFO of Prudential — "one of Lincoln's main competitors in the life insurance business" — stated that there was an industry study indicating that "experience is more adverse in some of our assumptions of our US life insurance business."  *Id.* ¶ 55.  On August 2, 2022, following its annual assumption review, Prudential announced that it had taken a $1.4 billion charge to increase reserves, related to its "guaranteed Universal Life products" where it lowered lapse assumptions based on "recently released studies and surveys as well as [] recent emerging experience."  *Id.* ¶ 58.

Analysts discussed the "proprietary industry study" and wondered whether other insurers would react similarly.  *Id.* ¶¶ 59, 62.  Lincoln had not yet conducted its annual assumption review, which it does during the third quarter of every year.  *Id.* ¶ 46.  On August 4, 2022, during Lincoln's 2022 second quarter earnings teleconference (two days after Prudential's announcement), defendant Freitag acknowledged the industry study that affected Prudential and discussed lapse rates generally.  *Id.* ¶¶ 63-68.  Defendant Freitag allegedly stated "there was a particular study this year focused on GUL.  We participated in that.  So we have that study.  And I'm sure the team will incorporate any new things they can learn from that process."  *Id.* ¶ 121.  And regarding lapse rates, defendant Freitag stated "[t]hey haven't recovered all the way back to pre-pandemic levels, but they have come back up."  *Id*.  Local 295 alleges that these two statements were false or misleading because:

5

> by speaking about the industry study, it created a duty to disclose: (i) that the industry GUL study — which Lincoln possessed at the time of this statement and for which Lincoln had collected and provided its own internal information — was an extensive study that showed lower GUL policyholder lapse rates, particularly with respect to older age policyholders; (ii) that the lowered industry GUL policyholder lapse rates rendered Lincoln's GUL lapse assumptions inadequate; and (iii) that Lincoln's inadequate GUL lapse assumptions would require the reserves on its balance sheet to be significantly increased, which Defendants knew, or recklessly disregarded. *Id.* ¶¶ 122-23.

At this same teleconference, defendant Freitag was asked about SGUL exposure and capital adequacy, to which he said "so statutory reserving is primarily formula-based and develops reserves at a high level are meant to be conservative, right?  It's a solvency based reserving standard.  So feel very good about that it's very supportive of the sufficiency of reserves." *Id.* ¶ 124.  And when asked about certain "actuarial tests conducted in the SGUL reserving process," defendant Freitag stated "[b]ut once again, at the end of the day, we've seen the potential impact . . . decline over the time.  We haven't even talked about it for at least a year, near as I can remember.  So at a high level, we feel good about there." *Id.*  Local 295 says these statements — and others made on that day — were false and misleading for largely the same reasons as above. *Id.* ¶¶ 125-26.

The next alleged statements were made in September. *Id.* ¶ 133.  On September 8, 2022, defendant Freitag spoke favorably about the SGUL policies, stating "in fact, we've sort of come out of the negative situation and we've built up some level of sufficiency inside of those 2 subtests.  So, I feel good about the sufficiency . . .", and also acknowledging the industry study, saying "we'll hand use that information." *Id.* ¶¶ 133-35.  Local 295 argues that these statements — and others made on that day — were false or misleading for largely the same reasons as the August 4th statements. *Id.* ¶¶ 134-36.

On September 14, 2022, two weeks before the close of the third quarter of 2022, defendant Cooper allegedly described the industry study as "simply [] an input" that Lincoln would consider as it "look[s] at overall experience," and said that Lincoln expected it would have "even more of a cushion" for SGUL reserves from the prior year due to "interest rates being higher." *Id.* ¶¶ 137-39. Local 295 argues that these statements — and others made on that date — were false or misleading for largely the same reasons as the August 4th and September 8th statements. *Id.* ¶¶ 137-141.

**D. Lincoln acts in response to lower lapse rates.**

On November 2, 2022, Lincoln announced that it had taken a $2.197 billion charge. *Id.* ¶ 142. Lincoln purportedly attributed much of the charge to a "GUL lapsation assumption update." *Id.* ¶ 79. In its Form 8-K, Lincoln disclosed that "the review charge and the statutory impact both relate primarily to updated guaranteed universal life insurance lapse assumptions in response to emerging experience, combined with recently validated external industry perspectives." *Id.* ¶ 80. The Form 8-K also stated that a "[l]arge amount of industry study data gave confidence in updating assumption around older age policyholder behavior." *Id.* ¶¶ 80, 82. On Lincoln's 2022 third quarter earnings call, defendants Cooper and Freitag acknowledged the industry study as a contributing factor to the charge, as well as Lincoln's own data. *Id.* ¶¶ 85-86. Defendant Cooper stated, "with the industry study, we then had 7x the amount of information than what we had had just a couple of years prior." *Id.* ¶ 86.

Investors felt the effects. *Id.* ¶¶ 87-101. Defendant Freitag left Lincoln in February 2023, and Lincoln "transferr[ed] the risk of 40% of its entire in-force SGUL book to another company" shortly thereafter. *Id.* ¶¶ 146-48. Interestingly enough, "many of Lincoln's peers"

7

took "little to no action" following their annual assumption reviews. *Id.* ¶ 102. For example, one of Lincoln's peers — Brighthouse — made "no real updates" based on the lapse rate data because their assumptions were conservative. *Id.* ¶ 106.

## II.     Analysis

Local 295 brings this suit under the Securities Exchange Act of 1934 for violations of § 10(b) and § 20(a). Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Under Rule 10b-5 of the SEC's regulations, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

"Together, § 10(b) and Rule 10b-5 imply a private cause of action for securities fraud." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d Cir. 2023). And § 20(a) imposes joint and several liability on persons who control those that violate §10(b) and Rule 10b-5. 15 U.S.C. § 78(t). Claims under these provisions are subject to the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA). *Prudential*, 70 F.4th at 680. As the Third Circuit has noted, "'Congress expressly intended' to 'substantially heighten' the existing pleading requirements" with the PSLRA. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004) (quoting *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

"[T]hese heightened standards share a common foundation with the ordinary pleading standards in that speculative or threadbare allegations along with legal conclusions are

8

disregarded, and the remaining allegations are generally taken as true." *Prudential*, 70 F.4th at 680. But the "complaint must contain more than 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); it must include particularized allegations of fraud." *Prudential*, 70 F.4th at 680. Accordingly, the complaint must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

Before us is a motion to dismiss, in which Lincoln argues that Local 295 did not meet the PSLRA's requirements for misrepresentation and scienter. The PSLRA requires us to dismiss the complaint if Lincoln is correct. 15 U.S.C. § 78u-4(b)(3)(A).

### A.     **Local 295 fails to plead a false or misleading statement with particularity.**

The PSLRA imposes a particularity requirement for complaints, requiring plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The second prong of that requirement — the reason or reasons why the statement is misleading — is "of paramount importance." *Chubb*, 394 F.3d at 145.

Local 295's theory, generally, is that Lincoln possessed information showing that policyholders, particularly older ones, were keeping their policies in force longer than expected, which would require materially higher reserves. *See, e.g.*, DI 35 ¶ 122. Despite this, Lincoln allegedly downplayed the significance of the trend and misrepresented the strength of its reserves and capital position to investors. *See, e.g., id.* ¶ 84. Eventually, the truth was revealed when Lincoln had to take a sudden charge. *Id.* ¶ 79. The key assumption of this theory — the "why" — is that Lincoln possessed information making it clear it would need materially higher reserves

9

at each alleged statement, making defendants' statements false or misleading.

Statements 10 and 16, which Local 295 highlighted as its best allegations, rely on this assumption. DI 35 ¶¶ 124-25, 137-38; DI 56 at 12:17-23, 57:2-8.[2] Statement 10 was allegedly false or misleading because Lincoln had an industry study and internal information showing that older policy holders had lower lapse rates and "that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update." DI 35 ¶ 125. This allegation jumps from (a) data showing lower lapse rates for older policy holders to (b) Lincoln needing to update its assumptions. But the complaint includes no reason why (a) compelled (b), such that the alleged statements were false or misleading. And statement 16 is similar — Local 295 says Lincoln downplayed the "significance" of the industry study that showed older policy holders having lower lapse rates. *Id.* ¶ 138. Like statement 10, this statement assumes that the industry study compelled Lincoln to act (or in Local 295's words, that it had "significance" for Lincoln).

The assumptions in statements 10 and 16 are representative of all allegations in the complaint. Statements 4 through 19 explicitly rely on the industry study and Lincoln's internal information compelling Lincoln to act. DI 35 ¶¶ 117-141 (for example, paragraph 141 alleges that statement 18 in paragraph 140 was false or misleading because "Lincoln was currently in possession of an extensive industry [and] . . . internal experience . . . that, as a result, Lincoln's GUL lapse assumptions were in need of a substantial update"). Statements 1 through 3 rely on Lincoln having its "own in-depth GUL study" compelling Lincoln to act. *Id.* ¶¶ 111-16 (for example, paragraph 112 alleges that statement 1 in paragraph 111 was false or misleading

---

[2] Lincoln numbered the alleged statements in a chart attached to its motion to dismiss. DI 40-4. Statement 10 refers to paragraph 124, and statement 16 refers to paragraph 137.

because "Lincoln's own recent internal experience . . . including Lincoln's own in-depth GUL study . . . had already provided Defendants with deep insight into Lincoln's policyholders' anticipated behavior patterns and lowered GUL policyholder lapse rates, which Defendants knew, or recklessly disregarded"). To the extent statements 10 and 16 fail to reach the PSLRA's high bar for pleading, all other allegations face the same challenge.

Local 295 tries to justify its assumptions by telling us that lapse rate data was *so* dire it forced action — in other words, the data was so dire that it was dispositive. DI 45 at 9-11; DI 56 at 19:2-7. That is a tenable theory: "a company may be liable under Section 10(b) for misleading investors when it describes as hypothetical a risk that has already come to fruition." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017). That is, a company cannot downplay data known to be dispositive by saying it only *might* be impactful. If we can plausibly infer that Lincoln possessed data that was so dire it was dispositive when the alleged statements were made, then defendants may have "describe[d] as hypothetical a risk that has[d] already come to fruition." *Id.*

But Local 295 encounters two critical problems: it does not know when Lincoln possessed all lapse rate data, nor does it have the data. And so it fails to plead with particularity "the reason or reasons why the statement[s] [are] misleading," 15 U.S.C. § 78u-4(b)(1), a requirement "of paramount importance," *Chubb*, 394 F.3d at 145. Local 295 says:

> Defendants had the results of the Industry Study — showing lower GUL policyholder lapse rates, particularly with respect to older age policyholders — at least as of May 2022, six months before reporting any changes to Lincoln's lapse assumptions. And Lincoln itself was a participant in the Industry Study, meaning that its own lapse information had been collected and submitted. Lincoln also conducted its own "in-depth GUL study" — covering at least 2019 through 2022 — which measured "age 75+ policies that have faced a 'minimum fund or lapse'

11

decision" (hereinafter the "Lincoln Study").

DI 45 at 10.  This statement obfuscates Local 295's own allegations regarding the data.  First, there is the Lincoln Study, which — according to Local 295's own allegations — included data from 2019 to 2022.  DI 35 ¶ 83.  The complaint does not plead with particularity that Lincoln had this study at the time of the statements.  And given that the study included 2022 data, it's not clear that Lincoln had the complete study at the time of even the most recent alleged statements (September 2022).  *Id.*

Lincoln cannot be liable for statements contradicting the Lincoln Study if it did not have that information at the time of the statements.  "To be actionable, a statement or omission must have been misleading *at the time it was made*; liability cannot be imposed on the basis of subsequent events."  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (emphasis added); *see also Williams*, 869 F.3d at 244 ("allegations cannot rely exclusively on hindsight, but must be sufficient to show that the challenged statements were 'actionably unsound when made.'").  Because we do not know when Lincoln got its study results, we cannot infer misrepresentation in statements supposedly contradicting what the study eventually revealed.

Second, while we agree with Local 295 that Lincoln would have had the industry study and Lincoln's data submitted to that study, Local 295 does not plead with any particularity what this data shows.  Presumably this is because the industry study was proprietary and available only to participants, DI 35 ¶ 5; DI 56 at 24:18-24; 35:8-13, and there is no indication that Lincoln made its data available to the public.  For reasons discussed *infra* Part II(B)(2), we are not persuaded that the industry study was necessarily dire for Lincoln.  And Local 295 provides no basis for us to infer that Lincoln's internal data submitted to the industry study — whatever

12

dates it may have encompassed — was dire on its own. We cannot agree with Local 295's argument that "it is indisputable that Defendants had access to information contradicting their public statements" because the complaint does not actually plead that. DI 45 at 29. Accordingly, we find that Local 295 failed to plead "the reason or reasons why the statement[s] [are] misleading," 15 U.S.C. § 78u-4(b)(1), with requisite particularity.

**B.     Local 295 does not plead a compelling inference of scienter.**

The pleading requirements are even more onerous for scienter than for misrepresentation. Section 21D(b)(2) of the PSLRA requires that plaintiffs "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). "It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind" — the inference must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. We consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 323. And the "inquiry is inherently comparative." *Id.* We ask, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. Compared to "plausible, nonculpable explanations for the defendant's conduct," Local 295's theory of scienter "need not be irrefutable . . . or even the most plausible of competing inferences." *Id.* at 324 (internal quotations omitted). But it must be "at least as compelling as any opposing inference." *Id.*

Local 295 offers four paths to an inference of scienter. DI 45 at 28-33. According to Local 295, "all roads here lead to recklessness." *Id.* at 33. Lincoln says these are vague presumptions of knowledge insufficient under the PLSRA to establish scienter. DI 40-2 at 28-

13

34. We assess Local 295's four categories of scienter evidence in the following order: abundance of information, competitor behavior, specific context, and temporal proximity. And finally, we consider all allegations together. *Tellabs*, 551 U.S. at 326 (reasoning that the court's job is to "assess all the allegations holistically").

### 1. Abundance of information

Local 295 argues "it is indisputable that Defendants had access to information contradicting their public statements" and points to three sources of data that Lincoln purportedly had: "(i) Defendants possessed the Industry Study at least six months before the November 2022 revelations, ¶ 169; (ii) Lincoln had provided its own lapse data for inclusion in the Industry Study (which is ignored in Defendants' motion), ¶ 14; and (iii) Lincoln conducted its own internal study measuring GUL lapse rates for age 75+ policyholders — the same age group to which Defendants attributed the lapse assumption updates." DI 45 at 29-30.

As discussed *supra* Part II(A), this obfuscates Local 295's own allegations regarding the data. By Local 295's own allegations, the Lincoln Study included data from 2019 to 2022, DI 35 ¶ 83, so we do not know whether Lincoln had this study even at the last alleged statement (in September 2022). And Local 295 does not plead with particularity the reasons why the industry study was necessarily dire for Lincoln, nor why Lincoln's internal data submitted to the industry study was dire on its own.

Considering what the complaint actually alleged about data in Lincoln's possession, an inference of fraud is not "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. Rather than defendants acting intentionally or recklessly when speaking about lapse rates and related financial strength, it seems far more likely that Lincoln did

14

not have all material data in its possession yet. The "abundance of information" available to Lincoln does not persuade us that defendants acted fraudulently, especially because the complaint itself does not make clear what information Lincoln had at the time of each alleged statement.

### 2. Competitor behavior

Local 295 alleges that one of Lincoln's key competitors in the life insurance business, Prudential, took a $1.4 billion charge based largely on the industry study at issue in this case. DI 35 ¶¶ 55-62. Following Prudential's announcement, analysts expressed concern that Lincoln might be forced to make a similar decision. *See e.g., id.* ¶ 78. And Lincoln confirmed that it had participated in the same study as Prudential. *Id.* ¶¶ 65, 75. Local 295 says this "should have sounded alarm bells within Lincoln," making defendants reckless when speaking about lapse rates or responding to questions about the study. DI 45 at 31-32.

Taking Local 295's alleged facts as true, we know that Lincoln and Prudential were competitors in the life insurance business, they both participated in the industry study, and the study contributed to Prudential taking a significant charge. Based on those facts, Local 295 wants us to infer that the industry study was dire for Lincoln's life insurance business. But we are not so sure. First, Prudential did not blame the industry study as the sole reason for it taking a charge. DI 35 ¶ 58. Prudential said it acted based on information "gained from recently released studies and surveys as well as our recent emerging experience." *Id.* Certainly, the industry study was *part* of Prudential's decision, but we have no basis from which to infer that it was a significant part of that decision, much less a dispositive part. And before Prudential announced its decision to take a charge, it had stated only that the industry study was raising

15

questions about assumptions, not that it was compelling changes to assumptions. *Id.* ¶ 55.

And even if we assumed that the industry study was dire and dispositive for Prudential, we do not know why it would necessarily be dire and dispositive for Lincoln too. Prudential and Lincoln being competitors does not tell us they had comparable assumptions in 2022, such that the industry study compelled similar action. As Lincoln puts it, "[p]laintiff fails to plead specific facts regarding the Insurance Study, including its participants' identities, how their respective product mixes compare with Lincoln's, and why their individual experiences would even be relevant to Lincoln's." DI 40-2 at 30.

The flaw in Local 295's logic is underscored by a different section of the complaint, in which Local 295 tells us that "many of Lincoln's peers were not similarly impacted" by the need to change their reserves. DI 35 ¶ 102. Apparently "several of them took little to no action for their SGUL reserves following their respective 2022 annual actuarial reviews." *Id.* One competitor, Brighthouse, explained that it already had conservative assumptions, so "no real updates" were required. *Id.* ¶ 106. Local 295 does not connect the dots as to why Lincoln is more comparable to Prudential than, say, Brighthouse, such that the industry study compelled Lincoln to make significant assumption changes.[3] It seems a more reasonable inference that, like many of its competitors, Lincoln took the industry study under advisement and factored it into the final decision. Accordingly, we cannot plausibly infer that defendants were reckless when speaking about lapse rates or responding to questions about the study.

---

[3] It is appropriate for us to consider how the complaint undermines itself. *Prudential*, 70 F.4th at 682 (finding no plausibility when "by its own terms, the amended complaint undermines [its own] effort").

3.  **Specific Context**

Local 295's primary argument here is that "[m]any of [d]efendants' statements were responses to numerous questions from analysts on this issue" as support for scienter. DI 45 at 29. It cites *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) for this proposition. In *Avaya*, the Third Circuit explained that the "specific nature of the analysts' inquiries, by itself, [does not] create[] a strong inference of a culpable state of mind." 564 F.3d at 270. Instead, it was the speaker's "confident, unhedged denials" in the face of "what he knew," plus the analyst inquiries, that supported a strong inference of scienter. *Id.* Local 295 has yet to particularly plead what the speakers knew at the time of the alleged statements, nor does it plead "confident, unhedged denials," so this factor alone does not support scienter.

4.  **Temporal Proximity**

The last category is the temporal proximity between the alleged statements and Lincoln's charge — seven weeks from the most recent alleged statement. DI 35 ¶ 12. According to Local 295, defendants must have been reckless because some statements were made "in the waning days of 3Q22." DI 45 at 32. But the complaint alleges that "Lincoln conducts its annual assumption review in the third quarter of every year." DI 35 ¶ 46, not that the review was complete "in the waning days" of the third quarter.

Local 295 says that the temporal proximity between the alleged statements and the end of the third quarter shows recklessness — in short, given that the decision to take a charge would be announced soon, defendants should have known the real risk that Lincoln would have to do so. DI 45 at 32. We see no strong inference of that. The complaint alleges that insurance companies consider a variety of data during their unlocking process, DI 35 ¶ 161, and for Lincoln that

17

consideration ultimately culminated in a decision to take a charge, *id.* ¶¶ 161-68. And as discussed *supra* Part II(A), we cannot infer that Lincoln had all necessary data when the alleged statements were made. Accordingly, we do not find temporal proximity to raise a strong inference of scienter.

      Finally, we consider all the allegations together to see if there is a strong inference of scienter. *Tellabs*, 551 U.S. at 326. In addition to the topics discussed above that were raised specifically by Local 295 on scienter, we also consider statements Lincoln made after its assumption review process. According to the complaint, various statements made after Lincoln took a charge show that Lincoln knew lapse rate data was dire when it made the alleged statements. For example, defendant Freitag stated, "[c]ombining our own data with a significant amount of experience contained in the industry study that I referenced on last quarter's call gave us the credible data needed to update our assumptions[.]" DI 35 ¶ 14. Defendant Cooper stated, "with the industry study, we then had 7x the amount of information than what we had had just a couple of years prior." *Id.* And defendant Cooper referred to Lincoln's own study, which purportedly "provided deeper insights into anticipated behavior patterns in later policy durations." *Id.*

      There's no rule against looking into the book of wisdom; sometimes later facts can shed light on what speakers were thinking earlier. But none of the statements Local 295 points to tells us whether a particular study was dispositive for Lincoln. Instead, they affirm that Lincoln considered a variety of data in making its decision. And they do not tell us when Lincoln ultimately decided to take a charge. In a reading most generous to Local 295, perhaps we can infer that Lincoln's internal studies corroborated the industry study — in other words, all the

18

studies were bad for Lincoln.  And that made Lincoln take a charge.  But we cannot plausibly infer that Lincoln had all necessary data to make this decision at even the most recent alleged statement.  Accordingly, Lincoln's statements after taking a charge do not push Local 295's case into plausibility.

In sum, Local 295 does not plead that Lincoln had access to all necessary information at the time of the alleged statements, which weighs against scienter.  The remaining factors — competitor behavior, specific context, and temporal proximity — do not raise a compelling inference of fraud.  Taken together, the allegations more plausibly support the inference that Lincoln was still conducting its own assumption review at the time of each alleged statement and did not yet have dispositive information on whether it would take a charge.  Local 295 therefore fails to allege scienter as required by the PSLRA.

### III.    Conclusion

Local 295 has not alleged with particularity the reasons why the alleged statements were false or misleading at the time made, nor has it pled facts from which scienter is a compelling inference.  Therefore, Lincoln's motion to dismiss is granted in full.[4]  Local 295 has leave to amend its complaint.[5]

---

[4] If there is no liability under Section 10(b), there is no control person liability under Section 20(a).  *See City of Edinburgh Council v. Pfizer*, 754 F.3d 159, 177 (3d Cir. 2014).  Because we dismiss the Section 10(b) claim, the derivative Section 20(a) claims are also dismissed.

[5] "After amending once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but leave shall be freely given when justice so requires."  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (internal quotations omitted).  Lincoln requests that we deny leave to amend.  DI 40-2 at 34.  We note that

---

the amended complaint was the first complaint filed by Local 295, DI 35, because Donald Meade filed the original complaint, DI 1.  In any case, we see no "undue delay, bad faith, dilatory motive, prejudice, [or] futility" in Local 295 amending.  *Shane*, 213 F.3d at 115.  Accordingly, Local 295 has leave to do so.